*Henderson v. Boudreau, et al.* – 23 CV 4802
*Tyler v. City of Chicago, et al.* – 23 CV 4803

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **REGINALD HENDERSON,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 2023-cv-04802 |
| **KENNETH BOUDREAU, THE ESTATE OF** | ) | |
| **WILLIAM FOLEY, JOHN HALLORAN,** | ) | |
| **MICHAEL CLANCY, JAMES O'BRIEN,** | ) | |
| **PATRICK GOLDEN, RICHARD COUGHLIN,** | ) | Hon. Thomas Durkin |
| **ASSISTANT STATE'S ATTORNEY VIRGINIA** | ) | |
| **BIGANE, ASSISTANT STATE'S ATTORNEY** | ) | |
| **STEVEN KLACZYNSKI, CITY OF** | ) | |
| **CHICAGO, and COOK COUNTY.** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiff, REGINALD HENDERSON, by his undersigned attorney, for his complaint against former Chicago Police Detectives Kenneth BOUDREAU, John HALLORAN, Michael CLANCY, James O'BRIEN, and the Estate of William FOLEY; former Chicago Police Officers Patrick GOLDEN, Richard COUGLIN; former Assistant State's Attorneys Virginia BIGANE, and Steven KLACZYNSKI, and the CITY OF CHICAGO, and COOK COUNTY.

## INTRODUCTION

1.      Plaintiff, Reginald Henderson, spent 26 years incarcerated in the Illinois Department of Corrections for the 1994 murder of Rodney Collins  – a crime he did not commit.

2.      In and around March 1994, the Defendants conspired among themselves and with others, known and unknown, to prosecute Plaintiff for the murder of Collins while indifferent to the fact that he was innocent.

3.     The Defendant Officers' motive to frame Plaintiff, or more specifically his brother and co-Plaintiff Sean Tyler, derived from Tyler's role in exposing egregious police misconduct carried out by some of the Defendants in this case.

4.     Tyler had witnessed the 1991 shooting that resulted in the arrests of six juveniles, including Marcus Wiggins, a 13-year old, who was tortured into confessing to murder by now-disgraced former Chicago Police Commander Jon Burge and his henchmen, Defendants Boudreau and O'Brien. Having witnessed the shooting, Tyler knew Wiggins was innocent and was poised to give exonerating testimony at Wiggins' trial. Such testimony would corroborate Wiggins' claims of torture which were already making national and international news and led to a high-profile federal civil-rights lawsuit by Wiggins.

5.     A trial court judge suppressed Wiggins' confession and the case against him was eventually dropped. Wiggins' federal civil rights case against Burge and Defendants Boudreau and O'Brien resulted in a substantial monetary settlement. Defendants Boudreau and O'Brien were disciplined for their mistreatment of the juvenile defendants, and Jon Burge was fired from the police department in 1993.

6.     The Defendants in this case sought to exact revenge on Marcus Wiggins, Sean Tyler, and by extension his brother, Plaintiff Reginald Henderson. Because the City of Chicago condoned, indeed encouraged, the misconduct of the Defendant Officers, the Defendants were successful in their plot to frame Tyler and Henderson for the murder of Collins. Luckily for Wiggins, he was not in the state when Collins was shot but that didn't stop the Defendant Officers from trying to frame him too.

7.     Defendant Bigane and Klaczynski, both felony review assistant Cook County State's Attorneys, while acting in an investigative function and without any probable cause to

believe Plaintiff committed the crime, conspired between each other and the defendant officers to procure a fabricated confession from Plaintiff. For her part, ASA Bigane manufactured out of whole cloth a false oral statement that she attributed to the Plaintiff.

8.      All of the defendants concealed the fact that they had conspired to and did frame Plaintiff for the murders by attributing fabricated oral admissions to the Plaintiff, by coercing, threatening, and manipulating witnesses into making false statements implicating Plaintiff in the murders, and by physically coercing a fabricated handwritten statement from Plaintiff that he signed under coercion.

9.      No eyewitnesses to the murder identified Plaintiff, and no physical evidence connected him to crime. Without the Defendants' concealment of evidence, falsification of evidence, manipulation of witness testimony, and physical coercion of Plaintiff's false inculpatory statements, Plaintiff would never have been convicted.

10.      For nearly three decades, Plaintiff fought to prove his innocence while the defendant officers continued to frame countless men and lie about it under oath. Indeed, the Defendants in this case are among the most notorious, repeat offenders in the history of the Chicago Police Department and responsible for untold numbers of wrongful convictions.

11.      On September 21, 2021, Cook County Circuit Court Judge Flood vacated Plaintiff's convictions at the request of the State. That same day, the State moved for an order to *nolle prosequi* the charges against Plaintiff. Plaintiff had already served his entire 55-year sentence.

12.      Plaintiff now seeks compensation for the incalculable hardship and injury he suffered as a result of the Defendants' egregious misconduct.

## JURISDICTION AND VENUE

13.　　This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiff's rights as secured by the United States Constitution as well as the deprivation of rights under Illinois state law.

14.　　This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. Venue is proper under 28 U.S.C. §1391(b), because the parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred in this judicial district.

## PARTIES

15.　　Reginald Henderson is a 48-year-old man, is a citizen of the United States, and resides in Davenport, Iowa. Mr. Henderson spent 26 years incarcerated in the Illinois Department of Corrections for a murder he did not commit.

16.　　At all relevant times hereto, Defendants Detectives Kenneth Boudreau (#17998 or 20435), William Foley (#20450), John Halloran (#20453), Michael Clancy (#20325 or #20395), James O'Brien (#20466), and Defendant Officers Patrick Golden (#5363), Richard Coughlin (#2465) were members of the Chicago Police Department. All are sued in their individual capacities, and acted under color of law and within the scope of their employment during the investigation of the murder.

17.　　Defendants Virginia Bigane and Steven Klaczynski, at all relevant times, were Assistant Cook County State's Attorneys. Defendants Bigane and Klaczynski, while acting in an investigatory fashion, procured a fabricated statement from Plaintiff. Defendants are sued for conspiring with the Defendant Detectives and Officers to frame Plaintiff while acting in an investigatory capacity and without probable cause to believe that Plaintiff committed a crime.

18.　　Defendant City of Chicago is an Illinois Municipal Corporation, which employs

or employed the Police Officer Defendants at the time of the events giving rise to this suit.

19.     Defendant Cook County is a governmental entity within the State of Illinois which provides funding for the Cook County State's Attorney's Office, which is responsible for paying any judgment entered against the Defendant Assistant State's Attorneys Bigane and Klaczynski.

20.     Each of the individual Chicago Police Officer Defendants and Assistant State's Attorney Defendants are sued in his or her individual capacity, and each acted under color of state law and in the scope of his or her employment while engaging in the actions alleged in this Complaint.

## FACTUAL ALLEGATIONS

21.     On March 29, 1994, 10-year-old Rodney Collins was shot and killed near 5151 S. Winchester while playing outside with his friends.

22.     Plaintiff Henderson was at his girlfriend's (Katrina Bones) home located at 5221 S. Woods at the time of shooting. Also present in the house was Katrina's mother, Donna Bones.

23.     The Defendant Officers schemed to frame Plaintiff, his brother Sean Tyler, and Marcus Wiggins for Collins' murder despite the absence of evidence suggesting that Plaintiffs and Wiggins had any involvement in the shooting. Indeed, both brothers had strong alibi evidence that went entirely ignored by the Defendant Officers. For his part, Wiggins was never charged because he was not even in the state at the time of the shooting, making the frame-up plan untenable.

### The Defendant Officers' Vendetta Against Sean Tyler, and by Extension, his Brother Reginald Henderson

24.     The Defendant Officers used the tragic murder of Rodney Collins' to exact revenge on Sean Tyler, and by extension, his brother Reginald Henderson, because of Tyler's

role in exposing horrific misconduct on the part of Defendants Boudreau and O'Brien and their boss (and idol) Jon Burge.

25. On September 25, 1991, Alfredo Hernandez was shot and killed on the south side of Chicago. Six juveniles were arrested for the murder, including 13-year-old- Marcus Wiggins.

26. Sean Tyler, who was outside near his home at the time Hernandez was shot, witnessed the shooting and knew that Wiggins was not involved. Tyler was terrified to come forward with the exonerating information, because he had heard that police officers at Area 3 Violent Crimes had tortured suspects and witnesses. He was not wrong.

27. Wiggins was charged with Hernandez's murder and eventually confessed to the crime after suffering unimaginable terror at the hands of several Area 3 detectives, including Defendants O'Brien and Boudreau. Wiggins revealed that Defendants O'Brien and Boudreau beat him viciously with a flashlight and electroshocked him. Defendants Boudreau and O'Brien had been taught by their mentor Jon Burge how to use an electroshock device to physically coerce confessions from suspects.

28. Indeed, just two months after Wiggins' arrest, Jon Burge was separated from the Chicago Police Department in the wake of an OPS investigation that revealed that Jon Burge and officers under his command engaged in systematic abuse of arrestees that constituted planned torture. Burge was formally fired in 1993. Burge's minions, including the Defendant officers, were furious at Burge's treatment by the department and vowed to vindicate him.

29. Wiggins' coerced confession was later suppressed by a Cook County Circuit Court judge. After the suppression hearing, Sean Tyler was identified as a witness who would exonerate Wiggins. Because of his fear of retribution, the Cook County judge entered a

protective order directing all officers involved in the Hernandez investigation to avoid contact with Tyler. Unsurprisingly, Defendants Boudreau and O'Brien paid no mind to the court's order.

30.     Marcus Wiggins' case was eventually dismissed, and all of his co-defendants were either acquitted or had their cases dismissed by the State to the fury of the Defendants.

31.     The Office of Professional Standards ("OPS") found that Defendants Boudreau and O'Brien violated the rights of five juvenile arrestees, including Wiggins. Defendant Boudreau and O'Brien were also sued by Wiggins in a high-profile civil lawsuit that made national and international news. *Wiggins v. Burge, et al.,* 93 C 0199.

32.     The *Wiggins* civil lawsuit settled in 1996 for a significant sum of money.

33.     Suffice it to say, the Defendant Officers were out for vengeance.

### The Collins' Murder Investigation

34.     While Wiggins' criminal case and his civil lawsuit were making their way through the courts, the Defendants brazenly schemed to frame the Plaintiffs *and* Wiggins for the murder of Collins even while under the scrutiny of heavy media attention.

35.     Collins was shot and killed on the 5100 block of South Winchester street at roughly 5:00 p.m. on March 29, 1994. Witnesses to the shooting described two offenders: (1) Black male, 17 years old, 5'8", 130 lbs., hair in braids, and wearing a Black/Green FILA jacket; and (2) Black male, 16 years old, 5'6" years old, 130 lbs., wearing dark jacket and white pants.

36.     Defendants Foley and Clancy arrived at the scene of the shooting and decided that the shooting was carried out by Gangster Disciples ("GDs"), notwithstanding that the only evidence at the time consisted of witness statements describing the offenders as two Black males.

37.     Defendants Foley, Clancy, and Boudreau directed 9th District Tactical Officers to round up known GDs for questioning, including a person named Antoine Ward ("Twan"). The

Defendant Officers had no basis to believe that Ward was involved in the shooting but planned to bring him into custody to interrogate him to create probable cause to arrest the targets of their frame-up, namely Plaintiffs and Marcus Wiggins.

38.    At the direction of Defendants Foley, Clancy, and Boudreau, 9th District Tactical Officers arrested Ward in a home located at 51st and Honore after finding him asleep on the couch in the basement. The officers falsely testified at a suppression hearing that an unknown homeless man told them that GDs were hanging out in the basement of a house located at 51st and Honore and that after obtaining permission to enter the home, they woke up Ward who was sleeping on the couch. The officers falsely testified that they arrested Ward because he assaulted them when they shook him out of his sleep.

39.    Defendant Foley falsely claimed, both in a supplemental police report and under oath at Plaintiff's trial, that an anonymous person called him and told him that Ward and his friend "Yogi" (Kenneth McGraw) were present at the shooting. To bolster the fabricated "anonymous tip," Defendant Foley also falsely claimed that 9th District Tactical Officers disclosed that an "informant" told them that "Twan" and "Yogi" were involved in the shooting.

40.    In reality, the Defendant Officers had manufactured a false factual basis to arrest "Twan" and "Yogi" for the purpose of using them implicate the targets of their frame up, namely Wiggins, Tyler, and Plaintiff.

41.    After Ward was in custody at the 9th District, Defendant Boudreau picked him up and brought him to Area 1 for interrogation. Meanwhile, Defendants Foley, Clancy, Golden, and Coughlin arrested McGraw and brought him to Area 1 for questioning. Probable cause did not support the arrests of either men.

42.     Ward and McGraw were interrogated throughout the evening of March 29, 1994 and into the morning of March 30, 1994 by Defendants Boudreau, Foley, and Clancy among others. Ward and McGraw were beaten, threatened, and then promised release if they provided statements fed to them by the Defendants, statements that implicated Sean Tyler, his brother Reginald, and Marcus Wiggins.

43.     After hours of physical and psychological abuse, McGraw agreed to repeat a false statement implicating Plaintiff, Sean Tyler, and Marcus Wiggins as being involved in the Collins' murder in the presence of Defendant ASA Klaczynski. ASA Klaczynski knew that Ward and McGraw were arrested unlawfully and had been physically coerced into providing false statements implicating Plaintiffs; he nonetheless took the coerced, false, and fabricated statement.

44.     That McGraw's statement was coerced, false, and fabricated is not in question where it was later determined that Wiggins could not have been involved in the shooting as he was living in another state at the time of the crime.

44.     Defendants Foley and Clancy informed Defendant O'Brien to arrest Henderson in light of McGraw's coerced and fabricated statement. In the afternoon of March 30, 1994 (the day after the shooting), Plaintiff Henderson was arrested at girlfriend's house located at 5221 S. Woods. Plaintiff was taken to 51st and Wentworth (Area 1) and placed in an interview room.

**Arrest and Interrogation of Plaintiff Henderson**

45.     Once at Area 1, Plaintiff was shackled to a wall for a long period of time before the Defendant officers came into question him. Eventually, the Defendant Officers entered the interrogation room to interrogate Plaintiff.

46.     Evincing their knowledge that Plaintiff was Tyler's brother (and their intent to frame Tyler), the Defendant Officers repeatedly referred to him as "Reginald Tyler." Reginald's last name was actually Henderson.

47.     The Defendant Officers told Plaintiff that they knew he was involved because his brother "Droopy" (Sean Tyler's nickname) was there. The Defendant Officers also told Plaintiff that Wiggins was involved. Plaintiff asked to call his mother so she could call a lawyer for him. That request was ignored. Plaintiff repeatedly denied being present or having any knowledge of the shooting.

48.     Plaintiff told the Defendant Officers that he was at the home of his girlfriend's mother, Donna Bones, at the time of the shooting located at 5221 S. Wood. Plaintiff repeatedly denied any involvement in the shooting. The Defendant Officers made no efforts to corroborate Plaintiff's alibi.

49.     The Defendant Officers left out of the interrogation room but returned sometime later. Defendant Foley grabbed Plaintiff by the throat and told him he was lying. Defendant Foley threatened Plaintiff with wrongful prosecution if he did not cooperate with the Defendants by repeating the false narrative fed to him. Defendant Foley struck Plaintiff multiple times and threated to falsely charge him.

50.     At one point, Plaintiff's head was slammed into a desk when he refused to adopt the false statements being fed to him by the Defendant Officers. The Defendant Officers repeatedly threatened to charge Plaintiff with the shooting knowing that he was not involved and knowing that they had coerced McGraw into making false statements implicating him.

51.     Defendants Halloran and Boudreau admitted to interrogating Plaintiff and falsely claimed that he made inculpatory oral statements to them.

52.     Defendant Bigane interviewed Plaintiff at Area 1 in the presence of Defendant Halloran according to her. Plaintiff told Defendant Bigane that he was not involved in the shooting and that the Defendant Officers were mistreating him. In the presence of Defendant Bigane, the Defendant Officer slapped Plaintiff's head around his ears. Plaintiff made no statements to Defendant Bigane and Defendant Bigane did nothing to stop the abuse by the Defendant Officers. Defendant Bigane expressly condoned the Defendant Officers' conduct.

53.     Plaintiff remained in custody for over 48 hours. He was never read his *Miranda* rights; he was denied food and water; and he denied access to the restroom. Eventually, Plaintiff agreed to sign a statement crafted by the Defendant Officers.

54.     Fearful that his unlawful detention and coercive interrogation would continue indefinitely, Plaintiff signed a statement that he did not write. Present during the signing of the statement was Defendants ASA Steve Klaczynski and Defendants Foley and Clancy. Plaintiff told Defendants Klaczynski, Foley and Clancy that he would sign the statement to put an end to his abusive treatment, but the statement was crafted based on the false story orchestrated by the Defendants.

55.     Defendant ASA Klaczynski knew the statement was false and that Plaintiff was signing it under duress where Plaintiff never told Defendant ASA Klaczyniski from his own mouth the story that was written on the papers. Instead, Plaintiff just agreed to sign it out of fear of continued abuse.

56.     At some later point, the Defendants Officers with the knowledge Defendant ASA Klaczynski realized that Plaintiff's fabricated confession including a fact that could not be true, namely that Wiggins was involved in the shooting. Wiggins was living outside the state of Illinois at the time of shooting.

57.     The Defendant Officers with the knowledge and assistance of Defendant ASA Klaczynski falsely claimed that Plaintiff switched his story to replace Wiggins with another person named Travis Ashby. When the Defendants discovered that Ashby also had an air-tight alibi, the Defendant Officers with the knowledge and assistance of Defendant ASA Klaczynski falsely claimed that Plaintiff swapped out Ashby for Andrew Ganoway. Defendant ASA Klaczynski knew and participated in the construction of Plaintiff's false, fabricated and coerced statements where he helped change the story to conform to a shifting narrative formulated by the Defendants for the purpose of framing Plaintiffs.

58.     Neither the Defendant Officers nor the Defendant State's Attorneys disclosed the manner in which they and their fellow colleagues coerced and fabricated Plaintiff's statements. Neither the Defendant Officers nor the Defendant Prosecutors disclosed the manner in which they coerced fabricated statements from Ward and McGraw.

59.     Plaintiff Tyler was eventually brought into custody at Area 1 after telling the detectives where to find him. Tyler, a teenager who had limited contact with the criminal justice system, was interrogated extensively over the course of 12 hours.

60.     Like his brother, Tyler was physically abused, repeatedly threatened, and told he was a liar when he denied involvement in the shooting. Tyler provided a verifiable alibi that was ignored by the Defendant Officers.

61.     Following the physically coercive interrogation, Tyler eventually succumbed and provided a false statement fed to him by the Defendant Officers. After signing the statement, Tyler was taken to an emergency room because he was vomiting blood.

### Wrongful Prosecution of Plaintiff Henderson

62.     Plaintiff was charged and eventually tried for the murder of Rodney Collins.

63.     The State's case consisted entirely of fabricated evidence that was provided by the Defendant Officers and Defendant Prosecutors.

64.     Defendant Golden falsely testified at Plaintiff's suppression hearing and at trial that he [Golden] and his partner Defendant Coughlin picked up Plaintiff on the street on the afternoon of March 31, 1994 after learning that McGraw had implicated him in the shooting. Defendant Golden falsely testified that Plaintiff voluntarily accompanied them to Area 1 for questioning by detectives. In reality, Defendants Golden and Coughlin entered Donna Bones' home without an arrest warrant and arrested Plaintiff the afternoon of March 30, 1994 against his will, without his consent, and without probable cause to arrest.

65.     Defendant Golden also falsely testified at Plaintiff's trial that he learned information about Ward and McGraw in connection with Collins' shooting. Defendant Golden falsely testified that he tracked down McGraw and that McGraw voluntarily went to Area 1 for questioning. In truth, Defendants Foley and Clancy *directed* Golden to pick up McGraw and bring him to Area 1 for questioning. Defendants Golden and Coughlin raided the home where McGraw was sleeping and arrested him without probable cause. Defendant Golden's testimony to the contrary was a compete fabrication.

66.     Defendant Foley falsely testified at Plaintiff's trial that he received an anonymous phone call in connection with Collins' homicide, identifying the nicknames of Antoine Ward and Kenneth McGraw. This testimony was a blatant lie as there was no anonymous call. Defendant Foley also falsely claimed that Ward just happened to be in custody at the 9th District, when in truth, Defendants Foley, Clancy, and O'Brien had directed 9th District police officers to arrest Ward so they could interrogate him.

67.     Defendant Foley falsely testified that Plaintiff admitted his involvement in the crime to him and Defendant Halloran. Defendant Foley falsely claimed that Plaintiff was never physically assaulted or threatened by any officer, including himself. Defendant Foley did not disclose that he and his fellow officers manufactured a narrative to frame Tyler and Wiggins or that they demanded Plaintiff to repeat the false story. Defendant Foley falsely testified that Plaintiff's handwritten statement was voluntarily provided and that the information contained in the statement came from Plaintiff.

68.     Defendant Halloran also provided false and fabricated testimony at Plaintiff's suppression hearing at trial. Defendant Halloran falsely claimed that Plaintiff made inculpatory oral statements to him and Defendant Foley and again to him and Defendant Boudreau. Defendant Halloran lied when he testified that Plaintiff was not struck, threatened, or otherwise coerced into making these alleged oral statements. Defendant Halloran also provided false testimony when he testified Plaintiff made an inculpatory statement to Defendant Bigane.

69.     Defendant Bigane falsely testified at Plaintiff's trial that Plaintiff made an oral inculpatory statement admitting his involvement in the shooting, admitting that he planned the shooting with his friends, and provided a gun to one of the shooters. Defendant Bigane further lied when she denied that Plaintiff was not assaulted in her presence. Defendant Bigane, who. never memorialized the alleged confession, manufactured the false statement from whole cloth.

70.     Defendant ASA Klaczynski falsely testified that Plaintiff provided a handwritten statement that was free from duress and coercion. Defendant ASA Klaczynski had been present at Area 1 and had heard the Defendant Officers' use of coercive tactics with Ward, McGraw, and Henderson. He knew that physical abuse was used to obtain all of the statements, including Plaintiff's. He knew that the narrative that he wrote on the statement did not come from Plaintiff

but came from the Defendant Officers. He gave false testimony when he testified that the statements were obtained lawfully.

71.     The State also admitted into evidence the false, fabricated, and physically coerced handwritten statements of Kenneth McGraw even though McGraw denied the truth of the statement.

72.     Plaintiff was convicted based on the foregoing fabricated evidence and was sentenced to 55 years in prison on October 1, 1996.

### Plaintiff's Exoneration

73.     Plaintiff always maintained his innocence and worked tirelessly to prove it.

74.     Despite limited education and no resources, Plaintiff attempted to demonstrate his innocence through the filing of post-conviction petitions as a *pro se* litigant.

75.     Armed with new evidence showing a prodigious pattern and practice of misconduct by the Defendant Officers dating back decades, Plaintiff's actual innocence claims were advanced to a third-stage evidentiary hearing.

76.     Plaintiff was released from custody on April 16, 2020 after having served his entire sentence. He continued his quest to prove his innocence.

77.     On September 17, 2021, on the eve of a scheduled evidentiary hearing, the State consented to post-conviction relief for both Plaintiff and his brother. The State then moved to dismiss all charges against both Plaintiffs - 27 and 1/2 years after Plaintiff's wrongful arrest.

### Pattern of Misconduct By Defendants Foley, Halloran, Clancy, Boudreau, and O'Brien

78.     Since his trial and conviction, Plaintiff Henderson has learned that his experience with the Defendant Officers of Area 1 is not unique. This is not the first instance of Defendants

Foley, Halloran, Clancy, Boudreau, and O'Brien using physical and psychological abuse to close a case. These detectives have a long standing pattern of engaging in such misconduct.

79.     For example, Defendant Foley, the lead detective on Plaintiff's case and the detective primarily responsible for violently coercing a false confession and lying about Plaintiff's confession has since been revealed as the detective who obtained a false confession from Harold Richardson in the now-notorious "Englewood Four" case. In that case, all four convicted men were exonerated when DNA from a serial rapist murderer was discovered at the crime scene; that same DNA excluded all four defendants. Mr. Richardson was later awarded a Certificate of Innocence despite the confession obtained by Defendant Foley.

80.     In that same case, Defendants Foley and Boudreau coerced a false confession from one of Richardson's co-defendants, Terrill Swift. The City of Chicago recently paid over $31 million to settle claims that Defendant Foley and Boudreau coerced false confessions from the Englewood Four.

81.     After the Englewood four were exonerated, the FBI discovered an insider's account of how those false confessions were obtained. Former Assistant State's Attorney Terrence Johnson revealed that detectives, including Defendants Foley and Boudreau, told the Englewood Four they could go home if they cooperated by confessing to the crime and implicating others. They were told "witnesses go home." Johnson further reported that the detectives created a "cheat sheet" to help them keep their stories straight when testifying at the subsequent motion to dismiss brought by the Englewood Four.

82.     The Detectives were successful. The motions to suppress were denied and the Englewood Four were convicted despite, just as here, no forensic evidence inculpating them. Fortunately, advanced DNA testing helped exonerate the four.

83.     Defendant Boudreau is one of the notorious homicide detectives who, under former Chicago Police Commander Jon Burge, had a lengthy history of physically and psychologically coercing suspects to "confess" to serious violent crimes.

84.     In total, Defendant Boudreau managed to obtain murder confessions from more than a dozen people in which the charges were either dropped or the defendant was acquitted notwithstanding the "confessions."

85.     In an examination of thousands of murder cases in Cook County from 1991 through 2000, *The Chicago Tribune* found that Defendant Boudreau and many of his colleagues had been involved in a wide range of cases that ultimately collapsed even though they had obtained confessions.

86.     As *The Chicago Tribune* observed, "Boudreau stands out not only for the number of his cases that have fallen apart, but for the reasons. In those cases, Boudreau has been accused by defendants of punching, slapping or kicking them; interrogating a juvenile without a youth officer present; and of taking advantage of mentally retarded suspects and others with low IQs." See "Veteran Detective's Murder Cases Unravel," *The Chicago Tribune*, December 17, 2001, available at https://www.chicagotribune.com/investigations/chi-011217confession-story.html (last visited on July 18, 2023).

87.     For a two-year period in the early 1990s, Defendants Boudreau and his partners helped "solve" at least five murders with "confessions" that ended with acquittals. All of these suspects alleged that Defendant Boudreau and/or Defendant Halloran mistreated them to obtain false confessions.

88.     The list of abuses by Defendant Officers Foley, Halloran, Clancy, Boudreau, and O'Brien include the following, all of which are corroborated by sworn testimony:

a. In 1987, Defendant Foley worked with other Chicago detectives to obtain a false confession from Frank Bounds for a murder. The detectives hit Bounds on the head and threatened to implicate Bounds's girlfriend in the murder if he did not confess. As a result, Bounds agreed to sign a statement implicating himself in a brutal rape-murder that he alleges he had nothing to do with.

b. Anthony Robinson was arrested in 1987 for murder. Robinson asserted that he was repeatedly kicked and slapped by Defendant Foley and two other detectives during his interrogation. Three days later, Robinson sought medical treatment for his left ear and was diagnosed with a perforated eardrum. According to Robinson's sister, she observed her brother in the interrogation room handcuffed to a wall and bleeding from his nose and mouth; he later complained that he had been kicked in the groin. Robinson was released, but six months later, he was arrested on the same charge. After being slapped again by, upon information and belief, Officer Michael Kill, Robinson became extremely frightened that what happened to him before could happen again (and worse) and signed a false confession.

c. In 1988, Defendant Halloran and a partner struck Mickey Grayer in the stomach and groin with a flashlight, and punched and choked him.

d. Desmond Weston alleged that in 1990, he was abused by Defendant Moser along with Detectives Anthony Maslanka and Michal Kill while being interrogated. Weston was arrested for murder after he was identified as the perpetrator by Dwayne Macklin. Macklin has since fully recanted his identification, alleging that he only gave it because of the police officers' physical beating, threats and promises of a

lesser sentence on an unrelated charge that Macklin was facing. In 2019, Weston's
conviction was vacated and the charges against him were dismissed.

e.  In 1990, Cortez Brown was tortured by Defendant O'Brien into confessing to two
murders with which he had absolutely nothing to do. Defendant O'Brien, along with
Detectives John Paladino and Anthony Maslanka, beat Brown about his head and
body, including with a flashlight. Brown was denied food and his right to an attorney.

f.  In September 1991, Defendant Boudreau and other physically and emotionally
abused 15-year old Anthony Jakes in order to coerce a false confession for a murder
Jakes did not commit. During the over 16 hours Jakes was held and interrogated,
Boudreau and others slapped, punched, and kicked Jakes, threatened to recruit gang
members to kill his family, tried to burn Jakes with cigarettes, and deprived him of
access to food, water, and contact with an attorney or family member. Jakes was
convicted of the murder based on his false confession. In 2018, his conviction was
vacated, and Jakes filed a federal civil rights lawsuit against Boudreau and his
cohorts.

g.  In 1991, fifteen-year-old John Plummer was interrogated for 36 hours by Defendants
Boudreau, Halloran, Foley, and Clancy. After being physically beaten, he falsely
confessed to a murder. Defendant Halloran has taken the Fifth Amendment regarding
Plummer's allegations.

h.  In 1991, Sandy Cutis alleged that Detectives Moser and Paladino tortured him to
secure a confession. According to Curtis, Moser and Paladino struck him on his face
and lower body with their fists. Curtis also alleged that Paladino bent his finger back

and that unknown officers kicked him as he lay on the floor. As a result, Curtis confessed to a crime that he did not commit.

i.   Defendants Foley and/or O'Brien coerced a signed false confession out of Javan Deloney in 1991. The detectives denied his right to an attorney and used physical violence to coerce the confession, hitting him in the chest and slapping him in the face. This, all despite his insistence that he was not involved in the murder.

j.   In 1991, Defendant Boudreau obtained a murder confession from Alfonzia Neal, testifying that Neal waived his rights and signed a statement handwritten by a prosecutor. Experts established that Neal had an IQ in the 40s and that he was incapable of intelligently waiving his Miranda rights. Neal was acquitted at trial notwithstanding his signed confession.

k.   Gregory Logan was interrogated regarding a murder in 1991 by Defendants O'Brien, Foley and other officers. When he professed his innocence, the detectives beat him with a bat, pushed his head against the wall an pointed a gun to his head. He was also denied the right to an attorney.

l.   In 1992, Arnold Day was interrogated in connection with a murder investigation. After isolating Mr. Day in an interrogation room for hours, Defendants Boudreau and Foley forcefully grabbed Day by the neck and choked him. The detectives also threatened to throw Day out the window. Day ultimately confessed but was nonetheless acquitted of the murder after presenting compelling allegations of police torture.

m.   In 1992, Dedrick Warmack, Sherman Warmack and Dario Bailey were coached by Moser into falsely identifying Xavier Catron as having shot and killed Kendrick

Thomas. Dedrick Warmack recanted his testimony, along with the other two individuals, indicating that he was never certain that Catron was the shooter. Dedrick and Sherman Warmack testified that they only identified Catron after Moser told them to "focus in" on Catron.

n. In November 1992, Defendants Boudreau, Halloran, and O'Brien jointly induced Harold Hill, Dan Young, and Peter Williams to provide interlocking confessions to raping and killing a woman. Notably, records revealed that despite confessing to murder, Williams was actually incarcerated at the time of the crime. Because of his demonstrated innocence, Williams was never charged. Hill and Young, however, were convicted although their confessions implicated Williams, who was undeniably innocent. Again, later DNA evidence exonerated Hill and Young, leading to their release from prison.

o. In 1992, Clayborn Smith was interrogated for 37 hours about a murder he knew nothing about. When Mr. Smith professed his innocence, another detective kicked and punched his head and body, and Defendants Boudreau, Halloran, and O'Brien threatened to charge Mr. Smith's pregnant girlfriend if he did not confess. The detectives also grabbed Smith's neck, pulled his hair, and yanked his fingers back. At the end of the 37 hours, Smith falsely confessed. In pending post-conviction proceedings, the Court barred the state from denying that Boudreau and Halloran engaged in a pattern of abuse between 1990 and 2001.

p. In 1992, Kilroy Watkins was arrested and handcuffed to a metal ring in an interrogation room by Defendants Boudreau and Halloran, who then choked and punched him in order to get him to confess to a shooting. After more than 30 hours in

this room with minimal sleep and food, Watkins signed a false incriminating statement.

q. In May 1993, Terry King and Tyrone Hood were arrested for the murder of Marshall Morgan Jr. Detectives Foley and Lenihan tried to get King to confess by beating him about his face and body – just as Tyler was beaten here. King was left with a black eye, bumps on his head and lacerations inside his jaw. King was ultimately released without being charged when his alibi cleared.

r. Tyrone Hood was beaten about the body by Boudreau, Ryan, Lenihan and Foley while he was held at the lockup at 51st and Wentworth. Hood was also interrogated by Boudreau and Halloran. So too for the witnesses in Hood's case, a number of whom alleged the Defendants physically or psychologically coerced him. Hood has been granted a Certificate of Innocence, and his civil lawsuit against Defendants Ryan, Lenihan, Boudreau and Halloran recently settled.

s. Hood's co-defendant was a man named Wayne Washington. Washington alleged that he was held for two days. During that time, he was handcuffed, slapped in the face, had his chair knocked out from under him, threatened, and not given food or water until he agreed to give a false and fabricated statement inculpating himself and Hood in the murder. Washington has also been granted a COI, and his civil lawsuit against Defendants Ryan, Lenihan, Boudreau and Halloran recently settled.

t. In 1993, Emmett White was arrested by Defendants O'Brien, Clancy, Halloran and other detectives who hit him in the face, punched him in the body, threw him to the ground and stepped on his face, dragging his head across the floor of the interrogation room, all in an attempt to get him to falsely confess. Photographs of Mr. White

corroborated his testimony of his abuse. Although the police alleged that White confessed to the crime, when asked about White's allegations that he was beaten about the face and body, O'Brien and Halloran pled the Fifth Amendment.

u.  In 1993, Richard Anthony was forced to confess to murder by Defendant Boudreau's partner, who beat Anthony and denied him food, sleep, and use of the restroom in order to coerce Anthony into giving a false statement.

v.  Richard Anthony's co-defendant, Jerry Gillespie, was also beaten by Defendant Boudreau and his partner during his 30 hour interrogation, which included preventing him from contacting an attorney or his family and refusing to allow him to use the bathroom. As a result of the abuse, coercion and intimidation, Gillespie eventually gave a false confession.

w.  In 1993, the day after Tyrone Reyna's sixteenth birthday, he was beaten during an interrogation by Defendants Boudreau, O'Brien and Halloran, who refused to let him contact his family and beat him into confessing to a murder he did not commit. Reyna's co-defendants, Nicholas Escamilla and Miguel Morales, were arrested by Defendant Boudreau for murder despite the lack of any physical evidence or eyewitnesses linking Escamilla to the crime. The detectives tortured Escamilla by beating him and threatening to send his pregnant wife to jail if he did not confess. After many hours of abuse, Escamilla eventually falsely confessed. Although Morales was also beaten during his interrogation, he refused to confess.

x.  Therefore, to secure Morales' conviction, O'Brien, Halloran and Boudreau coerced John Willer and Raphael Robinson into identifying Morales as the offender.  For example, O'Brien used a very suggestive lineup: He grabbed Robinson by the neck

while Robinson was viewing a lineup and asked him "how many fingers am I holding up." When Robinson answered "three," O'Brien used this to say that Robinson had identified person number three.  In addition, O'Brien spoke with Robinson prior to his trial testimony to explain who committed the murder and where in the courtroom they would be sitting.

y.  When asked about their interrogation and coercion of Escamilla, Morales, Willer and Robinson during a deposition in a civil suit, O'Brien and Halloran refused to answer any questions for fear of subjecting themselves to criminal liability.

z.  In December 1993, Defendants Boudreau and O'Brien, with other detectives, "closed" two separate murders by coercing confessions from two intellectually disabled juveniles, Fred Ewing and Darnell Stokes, classmates in special-education courses. One expert concluded that Ewing "was unable to comprehend the substance of the confession which he allegedly made." Absent any other evidence connecting them to the crime, both were acquitted despite the confessions obtained by those Defendants.

aa. In 1994, Defendant Halloran and other police officers forced Sheila Crosby and Michael Sardin to identify Shondell Walker as the murderer in their grand jury testimonies. Halloran threatened to have the Department of Children and Family Services take Sheila Crosby's children away from her. They told Sardin that if he did not name Walker, he would be charged with the murder.

bb. In 1993, Richard Anthony was forced to confess to murder by Defendant Boudreau's partner, who beat Anthony and denied him food, sleep, and use of the restroom in order to coerce Anthony into giving a false statement.

cc. Richard Anthony's co-defendant, Jerry Gillespie, was also beaten by Defendant Boudreau and his partner during his 30 hour interrogation, which included preventing him from contacting an attorney or his family and refusing to allow him to use the bathroom. As a result of the abuse, coercion and intimidation, Gillespie eventually gave a false confession.

dd. Derrick Flewellen signed a confession coerced by Defendants Boudreau, Halloran, and others after being interrogated for more than 36 hours, during which time he was slapped, kicked punched, and slammed into the wall by Boudreau and other detectives before succumbing to their coercion. After spending almost five years in prison, Flewellen was acquitted of the two murders when DNA tests proved the crime was committed by someone else.

ee. In 1994, then 15-year-old Michael Saunders was arrested for murder and interrogated by Clancy and Paladino. According to Saunders, he was slapped on the neck and had an earring pulled out of his ear. He was also denied access to his mother and grandmother, and denied access to an attorney. Under the weight of this pressure, Saunders falsely confessed to a murder that he did not commit.

ff. In 1994, Defendants Boudreau, Halloran, Moser, and Graf beat Anthony Williams into falsely confessing to murder and armed robbery.

gg. In 1994, Jamie DeAvila was arrested for murder and interrogated by Boudreau. When DeAvila explained that he was not involved in the crime, Boudreau barked back that it did not matter because Boudreau "was going to plant a nigger and the crime scene to point [him] out as the driver of the murderer." DeAvila eventually falsely confessed to murder.

hh. In August 1994, David Wright was arrested and coerced into signing a false confession. Wright has testified that Boudreau physically assaulted him, including choking him and shoving him against the wall, and that Halloran made a false promise of leniency. As a result, and after an extended period in custody, Wright signed a false confession he did not write. Following an evidentiary hearing, in 2022, the conviction was vacated and the State dismissed all charges against Wright in 2023.

ii. In 1995, Defendants Boudreau, Halloran, and O'Brien interrogated and coerced confessions from Oscar Gomez, Eric Gomez, and Abel Quinones. Their tactics included holding all three men for 30 hours, beating them while they were shackled to the wall, and preventing them from communicating with an attorney or their families, all in a successful attempt to coerce false confessions. All three defendants were found not guilty, based largely on the conclusion that the detectives physically coerced their confessions.

jj. In 1995, Defendants Boudreau and Halloran were part of a team of detectives who physically abused John Wright until he agreed to implicate Malik Taylor and Michael Taylor in connection with a murder.

kk. Kylin Little was a witness to a 1996 murder. When O'Brien, Halloran and Boudreau interrogated him, they physically and psychologically coerced him until he lied and implicated Eric Gibson, a man who had absolutely nothing to do with the crime. Since his interrogation, Little has fully recanted the statement he gave to police.

ll. In 1996, Defendant O'Brien caused to individuals at the scene of a crime to falsely identify Jeremy Allen. Allen was ultimately acquitted at trial.

mm.    In February 1997, Robert Wilson falsely confessed to slashing a woman with a knife after being slapped and threatened by Defendant O'Brien. O'Brien withheld evidence from the victim that another man, one who exactly fit the description of the perpetrator, had slashed several persons in the same area at about the same time. The victim ultimately recanted her identification of Wilson, but not before Wilson had spent almost 10 years in jail. In a deposition in an unrelated civil suit, O'Brien and Halloran both took the Fifth Amendment when questioned about Wilson's allegations of abuse.

nn. After police officer Michael Ceriale was shot to death in 1998, Defendant Boudreau and other detectives arrested Jonathan Tolliver at 4:00 a.m. and interrogated him for a 24-hour period, resulting in allegedly incriminating (unwritten and unsigned) statements. Tolliver was never advised of his rights, no miranda waiver was created, and his request to speak with a lawyer and/or his mother were refused. Boudreau claimed that the protections for minors were not utilized because Tolliver, who was 16 years old, had lied about his age, falsely claiming to have been eighteen. After two trials, Tolliver was convicted of Ceriale's murder.

oo. In connection with the Ceriale murder, Defendant Boudreau, among others, coerced statements from other witnesses to incriminate Tolliver. The means of coercion included an intentional withholding of insulin from one diabetic witness for more than 24 hours. When these witnesses later refused to testify at trial consistent with the false statements coerced by Boudreau, the State charged five of them with perjury and at least one of them went to jail for it.

pp. In 1998, Defendants O'Brien and Halloran punched Antoine Anderson in the lip and chest, threatened to take away his children, and denied him his right to an attorney. At the time Mr. Anderson was 17 years old and could barely read or write.

qq. In 1998, Defendants Boudreau and Halloran held Joseph Jackson in an interrogation room in connection with a murder. When Jackson refused to confess, Defendants Boudreau and Halloran placed a book on his chest and stomach and hit the book with a blackjack, so as not to leave visible marks on Jackson's body. Meanwhile, Defendants Boudreau and Halloran, using a torture technique referred to in the Department as "bagging," placed a typewriter cover over Jackson's head and cut off his air supply. As a result of this coercion, Jackson eventually confessed to a murder he did not commit.

rr. In 1998, Defendant Boudreau helped get a murder confession from a 13-year-old boy with a verbal IQ of 59. The judge later ruled that the boy did not have the mental capacity to waive his rights and threw out the confession. Prosecutors then dropped the charges.

ss. Christopher Holly filed a federal civil rights lawsuit against Defendant Boudreau and other detectives alleging that he was framed for a murder in 1998.

tt. In May 1994, Fabian Pico was 16 years old when he gave a self-incriminating statement to Boudreau and another detective that was used to convict him of murder. When Pico moved to suppress the statement on the grounds that police did not allow him access to his mother, Boudreau claimed he had tried unsuccessfully to reach Pico's mother by phone before Pico confessed; but Boudreau's supposed attempt was not memorialized anywhere in his reports.

uu. In 1994, Nevest Coleman, an educated man with no criminal record, was arrested for a rape and murder he did not commit. Given that the body was buried in the basement of Coleman's apartment building, Boudreau, Halloran, Foley and Clancy set their sights on Coleman. Coleman repeatedly denied his involvement in the rape and murder, which was met with punches to Coleman's face. Eventually, the officers fed Coleman details about the crime and Coleman falsely confessed to being a lookout. In 2016, DNA evidence exculpated Coleman and his co-defendant. In 2017, Coleman was exonerated and the state dismissed all charges.

vv. Richard Malek alleges that Defendant Boudreau and other detectives kept him in an interrogation room for four days, depriving him of sleep, food, and access to lawyers, as well as using violence (they knocked out his tooth) and threats to shoot him (Russian Roulette) in an attempt to coerce his confession. Boudreau participated in this coercion, but played the "good cop," uncuffing Mr. Malek and providing him with a McDonalds hamburger after he had been starved for an extended period. When they falsely claimed to have obtained an "oral" confession, Mr. Malek filed a federal lawsuit against Defendant Boudreau and others.

ww. In 1996, Andre Brown was handcuffed to a wall, threatened that he would never see family again if he did not confess to the shooting, was denied his request to speak with his mother or an attorney and was denied access to the restroom, all by Defendants Boudreau and Halloran and their brother officers.

xx. Marcus Wiggins brought a lawsuit against Defendants Boudreau, O'Brien and others alleging that he was handcuffed to a wall and beaten in an interrogation room while being questioned with a group of youngsters in a 1991 murder case. The detectives

denied Wiggins's mother access to her son, who was a 13-year old eighth grader at the time of the coerced confessions. The other young suspects also gave confessions, many of them after being physically beaten as well. For example, Jesse Clemon and Iamari Clemon alleged that they were struck about their bodies, including with fists and flashlights. Two of these confessions were later thrown out on the basis of the "periodic screaming [at the police station] throughout the night," screaming that Boudreau testified he did not hear. All of the defendants were either acquitted or had their cases *nolle prosequied* by the State. In civil depositions in an unrelated lawsuit, O'Brien and Halloran took the Fifth Amendment when asked questions about the torture of Marcus Wiggins and his co-defendants.

yy. As mentioned above, after being beaten by Defendants Boudreau and O'Brien, Jesse Clemon signed a written statement with his left hand (because his right hand had been injured). Witnesses in the station heard hollering and protests of "I didn't do it." Boudreau testified that the statement was not coerced, but the judge suppressed it anyway due to the "horrendously oppressive" atmosphere at the station. During their investigation, Defendants Boudreau and O'Brien also threatened, beat, and electroshocked Jesse's brother, Demoni, and beat his other brother, Iamari, with a flashlight.

zz. In August 1991, Curtis Milsap was slapped in the face while handcuffed and kicked in the testicles by O'Brien until he confessed to a double murder about which he had no knowledge. Notwithstanding his confession, Milsap was ultimately acquitted of the murders.

aaa.　　In 2001, Marcellous Pittman was arrested for a murder that he did not commit. During his interrogation by Halloran and O'Brien, Pittman was beaten about his body and coerced into making a false confession. In 2022, a court vacated Pittman's conviction after finding his allegations credible and specifically finding that Halloran's and O'Brien tortured Pitman. The State then dismissed all charges against Pittman.

bbb.　　In 2004, Defendant Boudreau was involved in the illegal search and seizure of Francis Bell. Defendant Boudreau beat Bell into signing a consent to search after Defendant Boudreau already did the illegal search.

89.　　There are many other examples of similar misconduct by these same Defendant Officers.

90.　　The codefendants and witnesses involved in the investigation of the crime for which Plaintiff was convicted make similar allegations against the Defendant Officers. As also briefly mentioned above, Antoine Ward accused officers Halloran, Clancy, Foley and O'Brien of stepping on his left hand, hitting him on the head, and refusing to let him use the restroom while he was in interrogation for over 48 hours until he eventually urinated into a desk drawer.

91.　　Kenneth McGraw claims that Defendant Boudreau beat him until he agreed to give a statement implicating the men who were eventually convicted, including Plaintiff.

92.　　Michael Taylor accused Defendants Halloran, Clancy, Boudreau and Moser of handcuffing him to a coat rack, slapping him, kicking him in the groin, punching him in the head, and dropping him to the floor. He claims he was never read his Miranda Rights and was denied access to an attorney. He was given a statement to sign that was not true and included information he never provided.

93.     Sean Tyler, Plaintiff's brother, was beaten in his chest and face until he vomited blood and signed a confession.

### The City of Chicago's Policy and Practice of Prosecuting Innocent People in Violation of their Constitutional Guarantees

94.     The Chicago Police Department is responsible by virtue of its official policies and practices for scores of miscarriages of justice like those its employees inflicted on Plaintiff.

95.     Since the 1980s no fewer than 100 cases have come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence to convict innocent people for serious crimes they did not commit.

96.     These cases include many in which Chicago police officers used the same tactics that Defendants employed against Plaintiff in this case, including but not limited to, using physically and psychologically coercive tactics to obtain involuntary and false confessions, fabricating evidence, concealing exculpatory evidence, manipulating or threatening witnesses to influence their testimony —all to secure the arrest, prosecution and conviction of a person without probable cause and without regard to the person's actual guilt or innocence.

97.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, routinely fabricated evidence against innocent people by coercing (physically and psychologically), manipulating, threatening, pressuring, and offering inducements to suspects and witnesses.

98.      As a matter of widespread custom and practice, members of the Chicago Police Department, including the Defendants in this action, contrived false narratives that were fed to vulnerable suspects and witnesses, who then adopted those false narratives as their own so police could secure the wrongful conviction of an innocent person.

99.     In 2019, the Federal Bureau of Investigation and Department of Justice admitted Chicago Police Department supervisor, Jon Burge—a supervisor for the Officer Defendants at one point—was aware that on numerous occasions that detectives he was supervising participated in the torture and physical abuse of persons being questioned.

100.    Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured or offered inducements to make false statements.

101.    The municipal policy and practice set out in the paragraphs above was recently described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terrence Johnson. The report documents, among other things, that Chicago police detectives fed information to witnesses and coached them through court-reported and handwritten statements, and physically abused witnesses.

102.    In addition to the problems identified above, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

103.    Before and during the period in which Plaintiff was falsely charged with the Rodney Collins' murder, and later convicted of the murder, the City of Chicago operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City's Office of Professional Standards almost never imposed significant discipline against officers accused of violating civilians' civil and constitutional rights. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

104.     As a matter of both policy and practice, municipal policymakers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

105.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department, officers (including the Officer Defendants here) have come to believe that they may, without fear of adverse consequences, violate the civil rights of members of the public and cause the innocent to be charged with serious crimes. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

106.     The City of Chicago and its Police Department also failed in the years before Plaintiff's wrongful charging and conviction to provide adequate training to Chicago Police Detectives and other officers in the following areas, among others:

a.  The need to refrain from physical and psychological abuse of, and manipulative and coercive conduct toward, suspects and witnesses.

b.  The constitutional requirement to disclose exculpatory and impeachment evidence, including how to identify such evidence and what steps to take when exculpatory and/or impeachment evidence has been identified to ensure the evidence is part of the criminal proceeding.

c.  The risks of engaging in tunnel vision during investigation.

    d.   The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

107.    The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

108.    The City's failure to train, supervise, and discipline its officers, including the Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that Defendants committed against Mr. Henderson in this case. Constitutional violations like those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

109.    The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

110.    The City of Chicago's policymakers also approved the policies and practices described in the foregoing paragraphs and were deliberately indifferent to the violations of constitutional rights described herein.

### Plaintiff's Damages

111.    Plaintiff has suffered and continues to suffer enormous physical and psychological injury as a direct and proximate result of the Defendants' misconduct. Plaintiff was incarcerated for 26 years for a crime he did not commit. He woke up each day with this

reality, not knowing whether he would see his family outside prison property or ever

successfully prove the wrongfulness of his conviction and incarceration.

112.    Over the course of his 26 years of imprisonment, Plaintiff was separated from his

loved ones, including his infant daughter who was five months old when Plaintiff was

wrongfully arrested. He grieved the loss of some of those loved ones who he was never able to

embrace again after the Defendants took him from his life on March 30, 1994. Plaintiff

experienced the pain of missing his daughter as she grew from a baby into a little girl, a teenager,

a young woman, and a mother herself. Plaintiff went to prison with a baby girl at home and was

released when his daughter was 27 years old and he was a grandfather.

113.    As a result of Defendants' actions, Plaintiff continues to experience physical and

psychological pain and suffering, humiliation, constant fear and anxiety, deep depression, despair,

rage, and other physical and psychological effects from his years of wrongful conviction.

**COUNT I**
**42 U.S.C. § 1983 – Coerced (False) Confession Under Fifth and Fourteenth Amendments**

114.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully

set forth herein.

115.    As more fully described above, the individual Police Officer Defendants acting

individually, jointly, and in conspiracy, as well under color of law and within the scope of their

employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth

and Fourteenth Amendments by using violence, threats of violence, trickery, manipulation, and

deceit to compel Plaintiff against his will to make or adopt statements that were later used to

convict him.

116.    In the manner described more fully above, Defendants coerced Plaintiff to make

or adopt statements that were introduced as inculpatory evidence for crimes they knew he did not

36

commit. Defendants falsified police reports and gave false testimony before a grand jury and at trial about the misconduct they used in securing this false evidence. They failed to correct the fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

117.    The Police Officer Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

118.    Absent this misconduct, Plaintiff would not have been wrongfully convicted of the murder of Rodney Collins. Thus, the defendants' misconduct deprived Plaintiff of his constitutional right to a fair trial and directly resulted in Plaintiff's wrongful conviction.

119.    Notwithstanding its effect on the outcome of the trial or even the truth or falsity of the statements, the mere use of Plaintiff's physically coerced statements at his trial violates his Fifth and Fourteenth Amendment rights against compelled self-incrimination.

120.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

121.    As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

122.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT II
### 42 U.S.C. § 1983 – Fabrication of Evidence

123.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

124.     As more fully described above, the Defendants acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by fabricating Plaintiff's inculpatory statements and by testifying at Plaintiff's trial about those statements and by fabricating Kenneth McGraw's statements and introducing those statements at Plaintiff's trial.

125.     In the manner described more fully above, Defendants fabricated, coerced, and strong-armed a false handwritten statement from the Plaintiff that he signed under duress to stop the abusive interrogation. That fabricated statement was introduced against him as evidence at trial.

126.     In the manner described more fully above, Defendants fabricated, manipulated and/or solicited false statements from Kenneth McGraw implicating Plaintiff in the crimes that they knew he did not commit; falsified police reports; obtained Plaintiff's conviction using this false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

127.     Defendant ASA Bigane fabricated a false oral statement from whole cloth that she attributed to Plaintiff but did not memorialize and testified to the false statement at Plaintiff's trial.

128.     The Police Officer Defendants and Prosecutor Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

129.    Absent this misconduct, Plaintiff would not have been wrongfully convicted of the murder of Rodney Collins. Thus, the defendants' misconduct deprived Plaintiff of his constitutional right to a fair trial and directly resulted in Plaintiff's wrongful conviction.

130.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

131.    As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

132.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

### COUNT III
### 42 U.S.C. § 1983 – *Brady* Violations

133.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

134.    As described in detail above, all of the individual Police Officer Defendants, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by withholding and suppressing exculpatory evidence from Plaintiff and the prosecutors who tried the case.

135. The Prosecutor Defendants, while acting in an investigatory function, also withheld exculpatory evidence from Plaintiff during the pendency of his criminal proceedings, up to and including the time of Plaintiff's conviction.

136. The Defendants continued to suppress exculpatory evidence after Plaintiff's conviction. Had this exculpatory evidence been disclosed, Plaintiff would not have spent 26 years in prison for a crime he did not commit.

137. The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

138. As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

139. The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**COUNT IV**
**42 U.S.C. § 1983 – Prolonged Unlawful Detention**

140. Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

141. In manner more fully described above, the Defendant officers acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his Fourth and Fourteenth Amendment constitutional rights.

142.     The Defendants accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

143.     In so doing, the Defendants caused Plaintiff to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and in all such proceedings were ultimately terminated in Plaintiff's favor indicative of his innocence.

144.     The Defendants subjected Plaintiff to unauthorized and arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent, through the Defendants' procurement of a physically coerced confession, fabrication of evidence, and suppression, and withholding of evidence.

145.     The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

146.     As a direct and proximate result of this deprivation of his constitutional right, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

147.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT V
### 42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights

148.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

149.    All of the Defendants, and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to coerce, induce, and fabricate false evidence in the form of witness statements and testimony for the purpose of framing Plaintiff for a crime he did not commit.

150.    All of the individual Police Officer Defendants, and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to deprive Plaintiff of material exculpatory evidence and information to which he was lawfully entitled and to conceal their misconduct from Plaintiff, all in violation of Plaintiff's constitutional rights, as described above.

151.    In this manner, the Defendants acting in concert with other known and unknown co-conspirators, conspired to accomplish an unlawful purpose by an unlawful means.

152.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant joint activity.

153.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

154.    As a direct and proximate result of this of this illicit agreement referenced above, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

155.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT VI
### 42 U.S.C. § 1983 – Failure to Intervene

156.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

157.     In the manner described above, one or more of the individual Defendants, and other unknown individuals, stood by without intervening to prevent the alleged constitutional violations, despite having an opportunity to do so.

158.     These Defendants had ample, reasonable opportunities as well as a duty to prevent this harm but failed to do so.

159.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with willful indifference to Plaintiff's constitutional rights, and in total disregard of the truth and Plaintiff's innocence.

160.     As a direct and proximate result of this failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including, but not limited to, loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

161.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT VII
### 42 U.S.C. § 1983 – *Monell* Policy Claim

162.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

163.     The Chicago Police Department is responsible for scores of miscarriages of justice. Since 1986, no fewer than 100 documented cases have come to light in which Chicago Police Detectives amassed "evidence" against an innocent person for a serious crime that he did not commit. There are undoubtedly many more such cases that have not yet been discovered.

164.     The false charges against innocent people include numerous cases in which Chicago Police Officers used the very same tactics that the Defendant Officers employed against Plaintiff in this case, including: (1) physical abuse and coercion to procure an inculpatory statement/confession; (2) the fabrication of false oral statements; (3) concealment of exculpatory evidence; (4) physical abuse/coercion and manipulation of witnesses in order to obtain false statements against Plaintiff; and (5) the use of other tactics to secure the arrest, prosecution and conviction of a person without regard to his actual guilt or innocence of the offense.

165.     At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, systematically used prolonged physical violence and psychological coercion to force suspects to make false inculpatory and incriminating statements against themselves. As a matter of widespread custom and practice, these physically coerced statements from criminal defendants were routinely used to convict defendants at trial.

166.     Consistent with the municipal police and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, used physical violence and psychological coercion to overcome Plaintiff's will and force him to

regurgitate a false and fabricated confession that was later used as the primary piece of evidence against him.

167.    At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed at the close of the investigation, rather than being maintained as part of the official file.

168.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, concealed exculpatory evidence from Plaintiff, including evidence that Plaintiff's alleged handwritten statement was involuntary and procured through physical coercion, that Kenneth McGraw's statement was procured through physical violence, manipulation, threats and coercion, and that certain oral statements attributed to the Plaintiff were fabricated in their entirety.

169.    At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, routinely manipulated, tricked, lied to, and misled witnesses for the purpose of influencing their testimony to conform to a false narrative contrived by the officers themselves. As a matter of widespread practice and custom, these tactics were also used to induce false evidence against suspects.

170.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants,

manipulated, tricked, and improperly influenced the testimony of McGraw to falsely implicate Plaintiff in the shooting of Rodney Collins.

171.    The City of Chicago and the Chicago Police Department has failed to investigate any of the cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

172.    Prior to and during 1994, the year in which Plaintiff was falsely charged with the Collins' murder, the City of Chicago operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The Former Chicago Police Officer of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

173.    As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

174.    As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent

persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

175.　The defendant officers have a long history of engaging in the kind of investigative misconduct that occurred in this case, including the physical coercion of fabricated confessions, manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are dozens of known cases in which the Defendant Officers have engaged in serious investigative misconduct, including many cases in which they have manipulated and coerced witnesses and fabricated and concealed evidence, as he did in this case. Defendants engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

176.　The City of Chicago and its Police Department failed in 1994 and in the years prior to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

a.　The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

b.　The need to refrain from manipulation or potentially coercive conduct in relation to witnesses.

c.　The need to refrain from using physical violence, threats of violence, and psychological coercion to procure involuntary statements from suspects.

      d.     The risks of wrongful conviction and the steps police officers should take to minimize risks.

      e.     The risks of engaging in tunnel vision during investigation.

      f.     The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

177. The need for police officers to be trained in these areas was and remains obvious. The City of Chicago's failure to train Chicago Police Officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

178. The City's failure to train supervise and discipline its officers, including repeat offenders such as the Defendants in this case effectively condones, ratifies, and sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in this case. Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

179. The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

180. The policies and practices described in the foregoing paragraphs were consciously approved by the City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

181. The actions of all of the individual Police Officer Defendants were done pursuant to policies and practices of the Chicago Police Department were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago which were ratified by policymakers for the City of Chicago with final policymaking authority. These policies and practices included, among others:

a. conducting physically and psychologically or otherwise illegal or improperly coercive interrogations of suspects and witnesses in order to obtain false statements and wrongful convictions.

b. manufacturing and fabricating false suspect and witness statements and manipulating and lying to witnesses to influence unreliable and inaccurate testimony.

c. filing false reports and giving false statements and testimony about interrogations and witness interviews or constructing parts or all of witness statements; suppressing evidence concerning interrogations and/or witness interviews; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of fabricated witness statements, and otherwise covering up the true nature of those interviews and/or interrogations.

d. failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of misconduct, on how to avoid false arrests, wrongful imprisonments, malicious prosecutions, and wrongful convictions, and on the proper manner in which to conduct interrogations of witnesses and

arrestees. Among those the City failed to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control were the Defendants in this case.

e. perpetuating, encouraging and condoning the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-d above, whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated, suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to report. This code of silence caused police officers either to remain silent or give false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves or fellow officers from discipline, civil liability, or criminal charges. The code of silence also caused police officers to perjure themselves in criminal cases where they and their fellow officers have fabricated evidence or concealed exculpatory evidence.

182. The policies and practices described in this Count and in the factual allegations section of this Complaint were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights.

183. As a direct and proximate result of the City's actions, Plaintiff suffered injuries, including, but not limited to, emotion distress, as if more fully alleged above.

184. The City of Chicago is therefore liable for the misconduct committed by the Police Officer Defendants.

## COUNT VIII
## State Law Claim – Indemnification

210.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

211.     Illinois law provides that public entities must pay any tort judgment for compensatory damages for which its employees are liable based on upon the employees' misconduct committed within the scope of their employment activities.

212.     The individual Defendant officers are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described herein.

213.     Similarly, Defendant Bigane and Klaczynski are or were employees of the Cook County State's Attorney's office, an agency of Cook County, Illinois, who acted within the scope of their employment in committing the misconduct described herein.

**WHEREFORE**, Plaintiff Reginald Henderson. prays this Court enter judgment in his favor and against Defendants Kenneth BOUDREAU, John HALLORAN, Michael CLANCY, James O'BRIEN, the Estate of William FOLEY; Patrick GOLDEN, Richard COUGLIN, former Assistant State's Attorneys Virginia BIGANE, and Steven KLACZYNSKI, and the CITY OF CHICAGO, and COOK COUNTY.

### JURY DEMAND

Plaintiff demands trial by jury.

Respectfully Submitted,

**REGINALD HENDERSON**

By:   /s/JENNIFER BONJEAN
*One of Plaintiff's attorneys*

BONJEAN LAW GROUP
Jennifer Bonjean
Ashley Cohen
750 Lexington Avenue, 9th Floor
New York, New York 10022
(718) 875-1850

**Chicago Office:**
Bonjean Law Group, PLLC
53 W. Jackson Blvd., Ste. 315
Chicago, Illinois 60604