*Henderson v. Boudreau, et al.* – 23 CV 4802
*Tyler v. City of Chicago, et al.* – 23 CV 4803

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SEAN TYLER, | ) | |
| | ) | Case No. |
| *Plaintiff,* | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| THE CITY OF CHICAGO, KENNETH | ) | |
| BOUDREAU, JAMES O'BRIEN, JOHN | ) | |
| HALLORAN, MICHAEL CLANCY, | ) | |
| WILLIAM MOSER, ROBERT LENIHAN, | ) | |
| THE PERSONAL REPRESENTATIVE OF | ) | **JURY TRIAL DEMANDED** |
| THE ESTATE OF WILLIAM FOLEY, | ) | |
| and UNKNOWN EMPLOYEES OF THE | ) | |
| CITY OF CHICAGO | ) | |
| | ) | |
| *Defendants.* | ) | |

### AMENDED COMPLAINT

NOW COMES, Plaintiff, SEAN TYLER, by and through his attorneys, LOEVY &

LOEVY, and complaining of Defendants CITY OF CHICAGO (herein after "the City"),

KENNETH BOUDREAU, JAMES O'BRIEN, JOHN HALLORAN, MICHAEL CLANCY,

WILLIAM MOSER, ROBERT LENIHAN, THE PERSONAL REPRESENTATIVE OF THE

ESTATE OF WILLIAM FOLEY, and UNKNOWN EMPLOYEES OF THE CITY OF

CHICAGO (collectively referred to as "Defendant Officers") and, alleges as follows:

### Introduction

1.      Plaintiff, Sean Tyler, was just a teenager when he was arrested and later convicted

of a murder he did not commit. He spent 25 years in prison until he was exonerated and released

in 2021.

2.      Plaintiff's wrongful conviction was no accident; the Defendant Officers framed Plaintiff after he came forward as a witness in a separate high-profile case—the prosecution of Marcus Wiggins—to expose the Defendant Officers' misconduct.

3.      Wiggins was a 13-year-old boy who had been wrongfully accused of murder. Wiggins confessed after Chicago Police Department ("CPD") detectives, including some of the Defendants in this case, used violence and electroshocks during Wiggins's lengthy interrogation. Wiggins' case—and his allegations against the CPD—made national headlines.

4.      Plaintiff witnessed the murder for which Wiggins was wrongfully arrested and he knew that Wiggins was innocent. Plaintiff, however, was terrified that if he came forward, he would face retaliation from the CPD. As a result, the judge in Wiggins's case took the extraordinary step of entering a protective order barring any of the investigating officers in the Wiggins case, including some of the Defendants in this case, from having any contact whatsoever with Plaintiff, and permitting other CPD officers to have contact with Plaintiff only upon obtaining prior approval by the Court.

5.      The Defendants, however, did not comply with that order. To the contrary, they targeted Plaintiff just as he had feared, retaliating against him by pinning a separate murder on him and getting him to "confess" to that murder by physically and psychologically torturing a confession out of him. After he "confessed," Plaintiff was taken to the emergency room because he was vomiting blood.

6.      Defendants have a long history of engaging in such misconduct. Tragically, Plaintiff is but one of dozens of young Black men who have been abused by these Defendants during custodial interrogations.

7.      Plaintiff never gave up on proving his innocence. On September 17, 2021, the court vacated Plaintiff's conviction and the State dismissed all charges against him. After more than two decades in prison, Plaintiff was finally able to return home. He lost decades of his life and time with loved ones as a result of his incarceration.

8.      Plaintiff seeks justice for the constitutional harm caused by the Defendants as well as other harms and hardships he endured as a result of Defendants' actions. Plaintiff seeks redress for the loss of liberty he experienced.

### Jurisdiction and Venue

9.      This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious actions under the color of law and deprivation of Plaintiff's constitutional rights.

10.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

11.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction. In addition, many if not all of the Defendants reside in this judicial district.

### Parties

12.     Plaintiff, Sean Tyler, is a 46-year-old community leader and entrepreneur. He resides in Chicago with his partner and enjoys spending time with community members and family after more than two decades of wrongful incarceration. Tyler currently owns a clothing company and speaks at educational institutions as a motivational speaker and about youth rights and justice.

3

13.     At all times relevant to the events described in this Complaint, Defendants Kenneth Boudreau, James O'Brien, John Halloran, Michael Clancy, William Moser, Robert Lenihan, the personal representative of the Estate of William Foley and unknown Chicago Police Officers ("Defendant Officers"), were police officers or otherwise employed by the Chicago Police Department acting under the color of law and within the scope of their employment.

14.     Defendant City of Chicago is an Illinois municipal corporation and is or was the employer of each of the Defendants listed in the preceding paragraph. The City of Chicago is liable for the policies and practices of the Chicago Police Department and for indemnification of the Defendants.

## Facts

### The Marcus Wiggins Case and Tyler's Protective Order

15.     On September 25, 1991, Alfredo Hernandez was murdered in Chicago, Illinois.

16.     Marcus Wiggins was only 13 years old at the time. Wiggins, along with a number of other juveniles (and one nineteen year-old), were arrested for the crime.

17.     Wiggins and the other teenagers alleged that the detectives, including some of the Defendant Officers named herein, coerced confessions out of them. In particular, Wiggins alleged that the detectives struck him in the head with a flashlight, repeatedly hit him in the chest, and electroshocked his hands. As a result of this torture, Wiggins confessed to a crime that he did not commit.

18.     An appellate court described the atmosphere at the police station that night as "coercive" and "oppressive," given the periodic screaming from the teenaged suspects that one witness overheard.

19.     Wiggins's allegations made news headlines, including publication in the *Chicago Sun-Times* of two articles—"3 Teens Say Police Used Shock Torture," and another "Cop Torture and Shock Allegations Date to the '70s."

20.     Indeed, the latter article referenced a long line of abuse in interrogations under disgraced former Commander Jon Burge, which the Office of Professional Standards described as a "systematic" in a 1990 report.

21.     Sean Tyler witnessed the Hernandez murder and knew that Wiggins had not committed it. After Wiggins's arrest, Wiggins's mother spoke to Tyler's mother and other members of the community, asking if they had any information about the Hernandez murder. Tyler's mother encouraged Tyler to come forward and tell the police about any information he had regarding the murder he had witnessed, including that Wiggins was not present for it.

22.      At that time, Tyler was only 15 years old and he was very scared of what the police might do to him if he came forward with this information because he had heard about how the police had treated Wiggins and his co-defendants.

23.     He was also frightened because once he was identified as a witness, approximately five plain clothes officers came to his home in unmarked cars and told him that "if he continued to help, that he may need help himself," or words to that effect, which Plaintiff interpreted as a threat.

24.     As a result, Wiggins's defense attorney, Julie Hull, had the court enter a protective order to protect Tyler from the police. That protective order stated:

    a.  No Chicago Police Officer, involved in the arrest and/or interrogation of Jesse Clemmons [*sic*], Diamonti Clemmons [*sic*], Dyez Owens, Tremaine Green, Clinton Webb, or M[arcus]W[iggins] on or about September 25, 1992 [*sic*], shall

have any contact, verbal, physical, or otherwise with Shawn [*sic*] Tyler of 5150 S.
Paulina and/or 5109 S. Marshfield, and

     b.    No Chicago Police Officer not involved in the arrest and/or interrogation of Jesse
Clemmons [*sic*], Diamonti Clemmons [*sic*], Dyez Owens, Tremaine Green,
Clinton Webb, or M[arcus] W[iggins] on or about September 25, 1992 [*sic*], shall
have any contact, verbal, physical, or otherwise with Shawn [*sic*] Tyler of 5150 S.
Paulina and/or 5109 S. Marshfield unless authorized in person by the Honorable
Judge Earl Strayhorn.

     25.    Ultimately, Wiggins' confession was suppressed and the State *nolle prosequied*
the charges against him. Indeed, each of Wiggins' co-defendants was either acquitted of
committing the Hernandez homicide or had the charges dropped against them. The case
completely unraveled.

     26.    In 1993, while Wiggins's criminal case was pending, Wiggins filed a civil suit
against the detectives who were involved in his wrongful arrest and prosecution, and in torturing
his false confession. Those detectives included Defendants O'Brien and Boudreau, and their
former Commander Burge. The case settled for a significant amount.

     27.    Also in 1993, the Office of Professional Standards investigated Wiggins'
complaints, along with those of Wiggins' co-defendants, and determined that the detectives,
including Defendants O'Brien and Boudreau, violated Departmental orders by taking statements
from the five juvenile suspects without a parent or guardian present.

     28.    The CPD also fired Burge in 1993, following allegations that he too had
electroshocked a suspect in custody—just as some of the Defendant Officers had done to
Wiggins.

29.     All told, the criminal investigation and prosecution of Wiggins and his co-defendants was an unequivocal and embarrassing failure: Not only did the City fail to properly identify and investigate the perpetrators of the crime, but also the investigation exposed the misconduct that the detectives, including Defendant Officers in this case, were willing to engage in to close a case.

### The Shooting of Rodney Collins

30.     In 1994, both Wiggins' prosecution and civil suit were still pending in state and federal court respectively.

31.     On March 29, 1994, around 5 p.m., 10-year-old Rodney Collins was shot and killed near his home on Winchester Avenue.

32.     Tyler had nothing whatsoever to do with this crime.

33.     At the time of the murder, Tyler was with his friends. Tyler had gone over to a friend's house earlier that afternoon to do what teenagers do: play video games. After doing that for some time, Tyler and his friends went to another friend's house and then to the mall. As they were driving back from the mall, they saw the police cars, an ambulance and even a helicopter around where they would later learn was a fatal shooting.

### The Frame-Up of Plaintiff

34.     Notwithstanding his absolute innocence of this crime, the Defendant Officers focused in almost immediately on Tyler as the perpetrator.

35.     That the Defendant Officers were targeting Tyler in retaliation for his role in the Hernandez case was clear: The Defendants also tried to pin the Collins murder on Wiggins even though Wiggins had unequivocal proof that he was in Wisconsin at the time of the crime. (He was too afraid of the police to stay in Chicago.)

36.     The Defendant Officers allegedly built their investigation on two "tips," both from conveniently unidentified sources: the first allegedly stated that there were a number of Gangster Disciples in the basement of a nearby home and that he purportedly heard an (unsubstantiated) rumor that the Gangster Disciples committed the Collins murder. The second was an anonymous tip that identified "Twan" and "Yogi" as the perpetrators of the crime.

37.     Based on those unidentified tips, the police raided a nearby home and arrested Antoine Ward, also known as "Twan." Ward was taken to Area One, where he was interrogated by the Defendant Officers.

38.     Ward told the Defendant Officers he had no knowledge of the crime. Unsatisfied with that answer, the Defendant Officers hit and threatened Ward, denied him access to a bathroom (he eventually urinated on the floor) and then left him in the interrogation room for 24 hours. After almost two days in custody, Ward agreed to give a statement falsely stating that he gave Carl Brannigan a gun.

39.     The Defendant Officers never disclosed the manner in which they got Ward to make this false statement.

40.     In the meantime, the Defendant Officers located "Yogi"—Kenneth McGraw—in the basement of a home. McGraw was intoxicated at the time and the Defendant Officers beat McGraw. After being beaten, McGraw agreed to sign a false statement fabricated by the Defendant Officers that claimed that "Droopy," "Stutter" and "Bullwinkle" were involved in the Collins murder.

41.     The Defendant Officers showed McGraw a photograph of Wiggins and he identified him as "Stutter." The Defendant Officers also showed McGraw a photograph of Reginald Henderson, Tyler's brother, and he identified him as "Bullwinkle." The Defendant

Officers, however, did not show McGraw a photograph of Tyler nor did they have him identify who "Droopy" was.

42.     Nonetheless, the Defendant Officers then began looking for Tyler. On information and belief, however, the Defendant Officers never tried to get an arrest warrant for Tyler nor did they ever contact Judge Strayhorn's chambers to seek permission to have "contact" with Tyler. Instead, they knowingly flouted the protective order that Judge Strayhorn had in place and went to Tyler's home to find him.

**Defendants Coerce a False and Fabricated Confession out of Tyler's Brother**

43.     Before the Defendant Officers spoke with Tyler, however, they interrogated his older brother, Reginald Henderson.

44.     The Defendant Officers told Henderson that they knew he had something to do with it because his brother was there. Henderson was then left alone, and handcuffed to a ring on the wall for a lengthy amount of time.

45.     When the Defendant Officers returned to the interrogation room, Henderson denied any involvement in the crime. At that time, the Defendant Officers grabbed Henderson by the throat, told him he was lying, and threatened that he would get 50 years for the murder if he did not cooperate with them. The Defendant Officers also punched him. The Defendant Officers then left Henderson handcuffed to a ring on the wall.

46.     When the Defendant Officers returned, they repeatedly beat him, including slapping him and slamming his head against the desk. Scared and in pain, Henderson agreed to sign the Defendant Officers' false and fabricated statement implicating himself, his younger brother Tyler, and Wiggins in the crime.

47.    In the more than 48 hours that Henderson was in custody before giving that statement, he was never read his rights or given food.

48.    On information and belief, at some point, the Defendant Officers learned that Wiggins could not have committed the crime because he was in Wisconsin. As a result, the Defendant Officers had Henderson replace Wiggins with Travis Ashby. When the Defendant Officers realized Ashby too had an alibi, the Defendant Officers replaced Ashby with Andrew Ganoway in Henderson's fabricated statement.

49.    The Defendant Officers never disclosed the manner in which they coerced Henderson into giving a false statement or the fact that they fabricated Henderson's false statement.

**Defendants Coerce Tyler into Giving a False and Fabricated Statement**

50.    Tyler learned that the police wanted to speak with him because Defendants came by his home and left a card with his mother. His mother encouraged him to provide the police with whatever information he knew about the crime.

51.    The protective order should have protected Tyler from any contact by any detectives, and particularly by any Defendant Officers involved in any way in the Wiggins prosecution. That, however, is not what happened.

52.    After he learned that the police wanted to talk to him, Tyler went to the McDonald's across the street from Area 1, where the Defendant Officers arrested him. The Defendant Officers relied on the fabricated statements that they had manufactured and attributed to McGraw and Henderson to create "probable cause" to arrest Tyler.

53.    Apart from being a witness in the Hernandez homicide, Tyler had had limited interaction with the criminal justice system before he was interrogated for the Collins murder.

10

54.    During repeated interrogations by the Defendant Officers, Tyler explained that he did not know anything about the Collins murder and did not have anything to do with it.

55.    Tyler also provided Defendants with his alibi.

56.    The Defendant Officers, however, were not interested in what Tyler had to say. Unsatisfied with his answers to their questions, the Defendant Officers told Tyler he was a liar, and repeatedly beat Tyler in the chest and slapped him multiple times in the face, near his eye. Tyler was told that he had better cooperate with the Defendant Officers or he would be further abused.

57.    The Defendant Officers then left the room and returned with a written statement signed by Henderson. Henderson was older, stronger and bigger than Tyler. As a result, after the Defendant Officers showed Tyler his brother's statement, Tyler was even more afraid, knowing his older brother had succumbed to the Defendant Officers' pressure.

58.    Tyler agreed to whatever the Defendant Officers wanted him to say because he was so scared, did not want to be hit again, and had no alternative left but to comply.

59.    Tyler gave a handwritten statement to the Assistant State's Attorney that was fabricated by the Defendant Officers and false.

60.    During his interrogation, the Defendant Officers described the murder to Tyler, including by asking leading questions. By feeding information to Tyler in this manner, the Defendant Officers made it seem like Tyler had knowledge of the crime when he did not.

61.    All told, Tyler's interrogation was 12 hours. During those 12 hours, Tyler was handcuffed, and denied access to a parent and lawyer.

62.    After his interrogation, Tyler sought medical attention and was taken to the emergency room in an ambulance because he was vomiting blood. Tyler was diagnosed with

hematemesis. According to a medical expert, hematemesis is consistent with trauma to the chest, as described by Tyler.

63.     The Defendant Officers never disclosed to the prosecutor the manner in which they coerced Tyler into giving a false statement or the fact that they fabricated his false statement.

**Defendants Secure Witness's False Identification of Plaintiff**

64.     There were a number of boys outside playing on the street with the victim just before the shooting occurred. None of those boys have ever identified Tyler as being involved in the crime. To the contrary, one has expressly indicated that Tyler was not involved.

65.     Nor was there a shred of physical evidence suggesting that Tyler was involved.

66.     To shore up evidence against Tyler and corroborate his fabricated confession, the Defendant Officers secured a false identification from a witness, who had seen two boys for a matter of seconds, but could not reliably identify either of them. Nevertheless, Defendant Officers obtained an identification and an oral statement from her wrongly identifying Plaintiff.

67.     Indeed, the witness did not have sufficient opportunity to observe the two boys; viewed the boys at a distance; and the lineup did not comply with established CPD standards at the time. For example, the lineup included multiple suspects in a single lineup.

68.     The State then paid to relocate the witness, providing her with moving expenses, a security deposit and the first month's rent. The extent of these benefits were never disclosed to Tyler.

**Plaintiff's Wrongful Conviction**

69.     Plaintiff was subsequently tried for the murder of Rodney Collins.

70.     During their testimony at Plaintiff's motion to suppress and at Plaintiff's criminal trial, the Defendant Officers testified falsely, including stating that Plaintiff voluntarily confessed.

71.     Based on Tyler's fabricated and false confession and the witness's false identification of Tyler, on September 27, 1995, Tyler was convicted of murder.

72.     Arrested at only 17 years old, on October 27, 1995, Tyler was sentenced to 58 years in prison. That sentence was later reduced to 50 years.

**Plaintiff's Exoneration**

73.     Plaintiff never gave up hope of proving his innocence.

74.     In the decades following his unsuccessful appeal, Tyler pursued his claim of innocence through a series of post-conviction petitions and through the Torture Inquiry and Relief Commission ("TIRC").

75.     Indeed, Tyler continued pursuing relief even after he was released on parole on February 15, 2019, having served the entire sentence for his wrongful conviction.

76.     In September 2015, the Illinois Appellate Court remanded Tyler's case for an evidentiary hearing on whether the Defendant Officers physically coerced Tyler's confession and whether the Defendant Officers conspired to fabricate evidence against Tyler.

77.     While that remand was pending, on October 20, 2021, TIRC issued a decision also instructing the circuit court to hold a hearing on Plaintiff's torture claim.

78.     On September 17, 2021, just before the evidentiary hearing was scheduled to begin, the State dismissed all charges against Plaintiff and his brother, Reginald Henderson.

79.     Plaintiff was finally free, after having served 25 years in prison for a crime that he did not commit, and fighting for another two-and-a-half years to clear his name.

## Defendants' Pattern of Misconduct

80.     This is not the first time in which Defendants Boudreau, O'Brien, Halloran, Foley, Lenihan, Clancy and Moser have worked together to "close" a case; nor is it the first time in which the detectives used physical and psychological torture to do so. Rather, as close co-workers, and often partners, these detectives have a longstanding pattern of engaging in such misconduct. Unfortunately, none of this evidence was presented at Tyler's motion to suppress or at his trial.

81.     In an article examining thousands of murder cases in Chicago from 1991 through 2000, *The Chicago Tribune* found that Chicago police detectives had been involved in a wide range of cases that ultimately collapsed even though the detectives had obtained confessions.

82.     That article specifically examined inculpatory statements taken by Defendant Boudreau. According to the Tribune's survey, "Boudreau stands out not only for the number of his cases [with confessions] that have fallen apart, but also for the reasons. In those cases, Boudreau has been accused by defendants of punching, slapping or kicking them. . . . ." Maurice Posley, Steve Mills, and Ken Armstrong, "Veteran Detective's Murder Cases Unravel," *Chicago Tribune*, Dec. 17, 2001.

83.     Additionally, those cases which "have fallen apart," often involved young, Black men—just as was the case here. Defendant Boudreau has described those men as winning "the ghetto lottery," because, according to him, "convicted murderers make false accusations in order to obtain money from the City in settlements."

14

84.     Yet, at least 16 men, if not more, have had their convictions overturned notwithstanding confessions taken by Defendant Boudreau. The number is even higher when other Defendant Officers are also included.

85.     Examples of the Defendant Officers' misconduct include, but are not limited to:

a.   In 1987, Frank Bounds was interrogated by Foley and two other officers. During his interrogation, Bounds alleged that the officers kicked him in the forehead and attempted to kick him in the groin. The officers told him that if he would agree to sign a statement, they would not release his girlfriend's name to the media. As a result, Bounds agreed to sign a statement implicating himself in a brutal rape-murder that he alleges he had nothing to do with.

b.   Anthony Robinson was arrested in 1987 for murder. Robinson asserted that he was repeatedly kicked and slapped by Foley and two other detectives during his interrogation. Three days later, Robinson sought medical treatment for his left ear; he was diagnosed with a perforated eardrum. According to Robinson's sister, she observed her brother in the interrogation room handcuffed to wall and bleeding from his nose and mouth; he later complained to her that he had been kicked in the groin. Robinson was released, but six months later, he was arrested on the same charge. After Kill slapped him again a few times, Robinson became extremely frightened that what had happened to him before could happen again (and worse) and signed a false confession.

15

    c.   In 1988, Halloran and a partner struck Mickey Grayer in the stomach and groin with a flashlight, and punched and choked him.

    d.   Demond Weston alleged that in 1990, he was abused by Moser along with Detectives Anthony Maslanka and Michael Kill while being interrogated. Weston was arrested for murder after he was identified by Dwayne Macklin as the perpetrator. Macklin has since fully recanted his identification, alleging that he only gave it because of the police officers' physical beating, threats and promises of a lesser sentence on an unrelated charge that Macklin was facing. In 2019, Weston's conviction was vacated and the charges against him were dismissed.

    e.   In 1990, Cortez Brown was tortured by O'Brien into confessing to two murders with which he had absolutely nothing to do. O'Brien, along with Detectives John Paladino and Anthony Maslanka, beat Brown about his head and body, including with a flashlight. Brown was denied food and his right to an attorney. During post-conviction proceedings, the court vacated Brown's conviction, finding the evidence of the officers pattern of misconduct "staggering" and "damning."

    f.   In September 1991, Boudreau and others physically and emotionally abused 15-year-old Anthony Jakes in order to coerce a false confession for a murder Jakes did not commit. During the over 16 hours Jakes was held and interrogated, Boudreau and others slapped, punched, and kicked Jakes, threatened to recruit gang members to kill his family, tried to burn Jakes with cigarettes, and deprived him of access to food, water, and

contact with an attorney of family member. Jakes was convicted of the murder based on his false confession. In 2018 his conviction was vacated, and Jakes filed a federal civil rights lawsuit against Boudreau and his cohorts.

g.  As noted above, Marcus Wiggins brought a lawsuit against O'Brien, Boudreau and others alleging that he was handcuffed to a wall, beaten and electroshocked while being questioned with a group of youngsters in a 1991 murder case. The detectives denied Wiggins' mother access to her son, who was a 13-year-old eighth grader at the time of the coerced confession. The other young suspects also gave confessions, many of them after being physically beaten as well.  For example, Jesse Clemon and Iamari Clemon alleged that they were struck about their bodies, including with fists and flashlights. Two of these confessions were later thrown out on the basis of the "periodic screaming [at the police station] throughout the night," screaming that O'Brien and Boudreau testified that they did not hear. All of the defendants were either acquitted or had their cases *nolle prosequied* by the State.  In civil depositions in an unrelated lawsuit, O'Brien and Halloran took the Fifth Amendment when asked questions about the torture of Marcus Wiggins and his co-defendants.

h.  In August 1991, 15-year-old Johnny Plummer was interrogated for 36 hours by Detectives Clancy, Foley, Boudreau and Halloran. Plummer alleged that he was hit in the face, stomach and side, including with a

flashlight, by the detectives. Halloran has taken the Fifth Amendment regarding Plummer's allegations.

i. In 1991, Sandy Curtis alleged that Detectives Moser and Paladino tortured him to secure a confession. According to Curtis, Moser and Paladino struck him on his face and lower body with their fists; Curtis also alleged that Paladino bent his finger back and that unknown officers kicked him as he lay on the floor. As a result, Curtis confessed to a crime that he did not commit.

j. In August 1991, Javan Deloney was arrested for murder. When he resisted Foley's and Kill's threats, the detectives became angry and repeatedly punched him in the chest and slapped him in the face. Foley also threatened to throw Deloney out the window if he did not confess. Deloney was denied the right to an attorney. As a result, Deloney signed a false statement implicating himself in murder because he was afraid of being beaten or worse.

k. In August 1991, Curtis Milsap was slapped in the face while handcuffed and kicked in the testicles by O'Brien until he confessed to a double murder about which he had no knowledge. Notwithstanding his confession, Milsap was ultimately acquitted of the murders.

l. Also in August 1991, George Anderson was arrested for two separate homicides. Anderson alleged that he was tortured into giving false and fabricated confessions over the course of 30 hours of police custody by Detectives Boudreau, Halloran, O'Brien, Kill and Stehlick. Following

18

proceedings before the TIRC and an evidentiary hearing, an Illinois
appellate court vacated Anderson's convictions and remanded for retrials
at which the State will be precluded from introducing his involuntary
confessions.

m. In 1991, Boudreau again took a false confession from another
intellectually disabled individual, Alfonzia Neal, whose IQ was in the 40s.
After being beaten, Neal agreed to give a confession that was patently
false. Neal was acquitted at trial.

n. Gregory Logan was interrogated regarding a murder in 1991 by O'Brien,
Foley and other police officers. When Logan professed his innocence, the
detectives beat him with a bat, pushed his head against the wall and
pointed a gun to his head. He was denied the right to an attorney.

o. In February 1992, Arnold Day was interrogated in connection with the
murder investigation of Rafael Garcia. After isolating Day in an
interrogation room for hours, Foley and Boudreau forcefully grabbed Day
by the neck and choked him. The detectives also threatened to throw Day
out the window. Day ultimately confessed, but was nonetheless acquitted
of the Garcia murder after presenting compelling allegations of police
torture.

p. In 1992, Dedrick Warmack, Sherman Warmack and Dario Bailey were
coached by Moser into falsely identifying Xavier Catron as having shot
and killed Kendrick Thomas. Dedrick Warmack recanted his testimony,
along with the other two individuals, indicating that he was never certain

19

that Catron was the shooter. Dedrick and Sherman Warmack testified that they only identified Catron after Moser told them to "focus in on" Catron.

q.   In October 1992, Clayborn Smith was smacked on the face and head, and punched in the ribs by Boudreau, Halloran and Foley. The detectives also grabbed Smith's neck, pulled his hair and yanked his finger back. After 37 hours of interrogation and physical torture, Smith confessed to a murder that he did not commit. In pending post-conviction proceedings, the Court barred the state from denying that Boudreau and Halloran engaged in a pattern of abuse between 1990 and 2001.

r.   In November 1992, Harold Hill, Dan Young and Peter Williams falsely confessed to rape and murder after Boudreau, O'Brien, Moser and Halloran physically assaulted and psychologically coerced them. Hill was only 16 years old at the time and could not withstand the detectives' physical violence. Similarly, after being kicked and struck about his body, Dan Young, whose IQ was 56, also falsely confessed to a crime with which he had absolutely nothing to do.  Indeed, even Peter Williams (who, it turned out, was incarcerated on an unrelated charge at the time of the rape-murder), falsely confessed after being chained to a radiator, hit with a blackjack and forced to urinate on himself. Williams was never charged; twelve years after their convictions, Hill and Young were exonerated when DNA evidence proved that they could not have been the offenders.

s.   In 1992, Kilroy Watkins was interrogated by Boudreau and Halloran. Watkins was choked, punched in the face, and held for over 30 hours.

20

Notwithstanding his actual innocence of the crime for which he was convicted, Watkins gave a confession to the detectives because he could not stand further physical abuse. The TIRC has subsequently referred Watkins' case for a hearing.

t.  In May 1993, Terry King and Tyrone Hood were arrested for the murder of Marshall Morgan Jr. Detectives Foley and Lenihan tried to get King to confess by beating him about his face and body – just as Tyler was beaten here. King was left with a black eye, bumps on his head and lacerations inside his jaw. King was ultimately released without being charged when his alibi cleared.

u.  Tyrone Hood was beaten about the body by Boudreau, Ryan, Lenihan and Foley while he was held at the lockup at 51st and Wentworth. Hood was also interrogated by Boudreau and Halloran. So too for the witnesses in Hood's case, a number of whom alleged the Defendants physically or psychologically coerced him. Hood has been granted a Certificate of Innocence ("COI"), and his civil lawsuit against Defendants Ryan, Lenihan, Boudreau and Halloran recently settled.

v.  Hood's co-defendant was a man named Wayne Washington. Washington alleged that he was held for two days. During that time, he was handcuffed, slapped in the face, had his chair knocked out from under him, threatened, and not given food or water until he agreed to give a false and fabricated statement inculpating himself and Hood in the murder.

21

Washington has also been granted a COI, and his civil lawsuit against Defendants Ryan, Lenihan, Boudreau and Halloran recently settled.

w.  In 1993, Emmett White was arrested by Clancy, O'Brien and Halloran. In an effort to secure his confession, O'Brien, Clancy and Halloran slapped White on his face and struck White on his body. When White told the officers that he did not have anything to say to them and was exercising his right to remain silent, the detectives became infuriated.  The detectives again struck White about the face and body, threw him on the ground and one of the officers stepped on his face. Although the police alleged that White confessed to the crime, when asked about White's allegations that he was beaten about the face and body, O'Brien and Halloran pled the Fifth Amendment.

x.  In 1993, Richard Anthony was forced to confess to murder by Defendant Boudreau's partner, who beat Anthony and denied him food, sleep, and use of the restroom in order to coerce Anthony into giving a false statement.

y.  Richard Anthony's co-defendant, Jerry Gillespie also confessed to murder after he was kicked and slapped about the face and body and choked during 30 hours of interrogation by Foley, Boudreau, O'Brien and Halloran. Gillespie was denied the right to an attorney and threatened with further beating, including being burned with a cigarette, if he did not sign the statement that was prepared for him. Both O'Brien and Halloran have

taken the Fifth Amendment on questions relating to Gillespie's allegations.

z.  In 1993, the day after Tyrone Reyna's sixteenth birthday, he was beaten during an interrogation by O'Brien, Boudreau and Halloran, who refused to let him contact his family and intimidated him into confessing to a murder that he did not commit. Reyna's co-defendants, Nicholas Escamilla and Miguel Morales, were arrested by the same detectives despite the lack of any physical evidence or eyewitnesses linking them to the crime. Boudreau, O'Brien and Halloran tortured Escamilla by beating him and threatening to send his pregnant wife to jail if he did not confess. After hours of abuse, Escamilla eventually confessed. Although Morales was also beaten during his interrogation, he refused to confess.

aa. Therefore, to secure Morales' conviction, O'Brien, Halloran and Boudreau coerced John Willer and Raphael Robinson into identifying Morales as the offender.  For example, O'Brien used a very suggestive lineup: He grabbed Robinson by the neck while Robinson was viewing a lineup and asked him "how many fingers am I holding up." When Robinson answered "three," O'Brien used this to say that Robinson had identified person number three.  In addition, O'Brien spoke with Robinson prior to his trial testimony to explain who committed the murder and where in the courtroom they would be sitting.

bb. When asked about their interrogation and coercion of Escamilla, Morales, Willer and Robinson during a deposition in a civil suit, O'Brien and

Halloran refused to answer any questions for fear of subjecting themselves to criminal liability.

cc. In December 1993, Boudreau, O'Brien and Halloran "closed" two separate murders by coercing confessions from two intellectually disabled individuals, Fred Ewing and Darnell Stokes. One expert concluded that Ewing was "unable to comprehend the substance of the confession which he allegedly made." Absent any other evidence connecting them to the crime, both were acquitted notwithstanding the "confessions" obtained by Boudreau and O'Brien. O'Brien and Halloran both refused to answer questions about Ewing's and Stoke's allegations that they were beaten by O'Brien, Halloran and Boudreau when in a deposition in an unrelated civil suit.

dd. In 1994, Halloran and other police officers forced Sheila Crosby and Michael Sardin to identify Shondell Walker as the murderer in their grand jury testimonies. Halloran threatened that if Crosby did not do so, he would have the Department of Children and Family Services take her children away from her. For Sardin, the detectives threatened that if he did not name Walker as the killer, he would be charged with the murder.

ee. After being interrogated for more than 36 hours, during which time he was slapped, kicked and punched in the face and body by Boudreau, Halloran and others, Derreck Flewellen signed a false confession. Flewellen spent almost five years in prison before being acquitted of the two murders

based on DNA tests, which proved the crime was committed by someone else.

ff. In 1994, then 15-year-old Michael Saunders was arrested for murder and interrogated by Clancy and Paladino. According to Saunders, he was slapped on the neck and had an earring pulled out of his ear. He was also denied access to his mother and grandmother, and denied access to an attorney. Under the weight of this pressure, Saunders falsely confessed to a murder that he did not commit.

gg. In 1994, Boudreau, Halloran and Moser beat Anthony Williams into falsely confessing to murder and armed robbery.

hh. In 1994, Jamie DeAvila was arrested for murder and interrogated by Boudreau. When DeAvila explained that he was not involved in the crime, Boudreau barked back that it did not matter because Boudreau "was going to plant a nigger at the crime scene to point [him] out as the driver of the murderer." DeAvila eventually falsely confessed to murder.

ii. In August 1994, David Wright was arrested and coerced into signing a false confession. Wright has testified that Boudreau physically assaulted him, including choking him and shoving him against the wall, and that Halloran made a false promise of leniency. As a result, and after an extended period in custody, Wright signed a false confession he did not write. Following an evidentiary hearing, in 2022, the conviction was vacated, and the State dismissed all charges against Wright in 2023.

jj. In 1994, Nevest Coleman, an educated man with no criminal record, was
arrested for a rape and murder he did not commit. Given that the body was
buried in the basement of Coleman's apartment building, Boudreau,
Halloran, Foley and Clancy set their sights on Coleman. Coleman
repeatedly denied his involvement in the rape and murder, which was met
with punches to Coleman's face. Eventually, the officers fed Coleman
details about the crime and Coleman falsely confessed to being a lookout.
In 2016, DNA evidence exculpated Coleman and his co-defendant. In
2017, Coleman was exonerated and the state dismissed all charges

kk. In 1995, Boudreau and Halloran interrogated and coerced a confession
from Oscar Gomez. The detectives held Gomez for 30 hours, repeatedly
beat him while he was shackled to the wall, and prevented him from
communicating with an attorney or with his family. Despite his
"confession," Gomez was found not guilty. O'Brien and Halloran both
took the Fifth Amendment when asked questions about their coercive
interrogation of Gomez.

ll. In 1995, Boudreau was part of a team of detectives who physically abused
John Wright until he agreed to implicate Malik Taylor and Michael Taylor
in a murder.

mm.     In 1995, Abel Quinones confessed to murder after being
interrogated for 30 hours and being repeatedly beaten by Halloran. Despite
his purported confession, Quinones was found not guilty. Halloran has

26

pled the Fifth Amendment when asked questions about the Quinones case in an unrelated civil deposition.

nn. Kylin Little was a witness to a 1996 murder. When O'Brien, Halloran and Boudreau interrogated him, they physically and psychologically coerced him until he lied and implicated Eric Gibson, a man who had absolutely nothing to do with the crime. Since his interrogation, Little has fully recanted the statement he gave to the police.

oo. In 1996, Jeremy Allen was wrongfully charged with murder after O'Brien coerced two witnesses into falsely identifying Allen. Allen was ultimately acquitted at trial.

pp. In February 1997, Robert Wilson falsely confessed to slashing a woman with a knife after being slapped and threatened by O'Brien. O'Brien withheld evidence from the victim that another man, one who exactly fit her description of the perpetrator, had slashed several persons in the same area at about the same time. The victim ultimately recanted her identification of Wilson, but not before Wilson had spent almost 10 years in jail. In a deposition in an unrelated civil suit, O'Brien and Halloran both took the Fifth Amendment when questioned about Wilson's allegations of abuse.

qq. After police officer Michael Ceriale was shot to death in 1998, Boudreau, O'Brien and Halloran arrested then-16-year-old Jonathon Tolliver at 4:00 a.m. and interrogated him for a 24-hour period, resulting in allegedly incriminating oral statements. To ensure Tolliver's conviction, Boudreau,

27

O'Brien and Halloran also coerced incriminating statements from other witnesses by holding them in custody for extended periods of time, physically abusing and threatening to lodge charges against them, withholding food, and denying access to a parent or attorney.

rr. In 1998, 17-year-old Antoine Anderson was interrogated by O'Brien and Halloran about a recent murder. The detectives hit Anderson in the face and chest, and threatened to take away his children. As a result of this abuse, and after being held for two days at the police station, Anderson falsely confessed to a crime he did not commit.

ss. In 1998, Boudreau and others held Joseph Jackson in an interrogation room in connection with a murder investigation. When Jackson refused to confess, Boudreau and another detective placed a book on his chest and stomach and hit the book with a blackjack to avoid leaving visible marks on Jackson's body. Boudreau and the detective also put a typewriter cover over Jackson's head and cut off his air supply. Jackson eventually confessed to a murder he did not commit.

tt. In 1998, Boudreau helped extract a murder confession from a 13-year-old boy with a verbal IQ of 59. The judge later ruled the boy did not have the mental capacity to waive his rights and threw out the confession, after which prosecutors dropped the charges.

uu. Christopher Holly filed a federal civil rights lawsuit against Boudreau and other detectives alleging he was framed for a 1998 murder.

28

vv. In May 1994, Fabian Pico was 16 years old when he gave a self-incriminating statement to Boudreau and another detective that was used to convict him of murder. When Pico moved to suppress the statement on the grounds that police did not allow him access to his mother, Boudreau claimed he had tried unsuccessfully to reach Pico's mother by phone before Pico confessed; but Boudreau's supposed attempt was not memorialized anywhere in his reports.

ww.       Richard Malek alleges that Boudreau and other detectives kept him in an interrogation room for four days, depriving him of sleep, food, and access to lawyers, and used violence and threats to coerce his confession. Boudreau participated in this coercion as the "good cop," uncuffing Malek and providing him with a hamburger after he had been starved for an extended period. When detectives falsely claimed they obtained an oral confession, Malek filed a federal lawsuit against Boudreau and others.

xx. In 2001, Marcellous Pittman was arrested for a murder that he did not commit. During his interrogation by Halloran and O'Brien, Pittman was beaten about his body and coerced into making a false confession. In 2022, a court vacated Pittman's conviction after finding his allegations credible and specifically finding that Halloran and O'Brien tortured Pitman. The State then dismissed all charges against Pittman.

**The City of Chicago's Policies and Practices Caused Plaintiff's Wrongful Conviction**

86. The Chicago Police Department is responsible for scores of miscarriages of justice like those the Defendant Officers inflicted on Plaintiff by virtue of its policies and practices.

87. Since 1986, no fewer than 70 cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence to convict innocent people for serious crimes they did not commit—numerous of which involve the named Defendant Officers.

88. So entrenched is this pattern and practice that an Illinois court recently prevented the State from contesting that Defendants Halloran and Boudreau had a pattern and practice of abusive misconduct in their investigations that they conducted between 1990 and 2001.

89. These cases include many in which Chicago police officers used the same tactics the Defendant Officers employed against Plaintiff in this case, including: (1) using physically coercive tactics to obtain involuntary, false, and fabricated confessions; (2) fabricating witness statements; and (3) concealing exculpatory evidence.

90. At all times relevant hereto, members of the Chicago Police Department, including the Defendant Officers in this action, routinely manufactured evidence against innocent people by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent people, knowing full well those statements were false. As a matter of widespread custom and practice, members of the Chicago Police Department, including the Defendant Officers in this action, contrived false narratives that were fed to vulnerable suspects and witnesses, who then adopted those false narratives as their own so police could secure the wrongful conviction of innocent people.

91.     In 2019, the Federal Bureau of Investigation and Department of Justice admitted Chicago Police Department supervisor, Jon Burge—a supervisor for the Defendant Officers—was aware that on numerous occasions, detectives he was supervising participated in the torture and physical abuse of persons being questioned. One such detective was Defendant Boudreau.

92.     Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured, or offered inducements to make false statements.

93.     The municipal policy and practice set out in the paragraphs above was recently described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, among other things, that Chicago police detectives fed information to witnesses and coached them through court-reported and handwritten statements, and physically abused witnesses.

94.     At all times relevant hereto, members of the Chicago Police Department, including the Defendant Officers in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information in files that were maintained solely at the police department and were not disclosed to other participants in the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of an investigation, rather than being maintained as part of the official file.

95.     Consistent with the municipal policy and practice described in the preceding paragraphs, employees of the City of Chicago, including Defendants, concealed exculpatory evidence from Plaintiff. The Defendant Officers also maintained clandestine files that were not

31

turned over to the prosecutor and were destroyed or hidden at the close of the Collins investigation, including, for example, documents relating to witness interviews.

96.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of *Rivera v. City of Chicago*, 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, 87 C 2536 (N.D. Ill.), among others.

97.     The policy and practice of file suppression at issue in *Fields* was in place from the 1980s through the 2000s, including during the commission and investigation of the Collins homicide described above.

98.     Additionally, a set of clandestine street files was found in the case of *Rivera v. City of Chicago*, 12 C 4428 (N.D. Ill.). Those files, which emanated from a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants. This means that this policy and practice was also in place during the commission and investigation of the Collins murder.

99.     In addition to the problems identified above, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

100.     Before and during the period in which Plaintiff was falsely charged with the Collins murder, and then later convicted of the Collins murder, the City of Chicago operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City's Office of Professional Standards almost never imposed significant discipline against police officers accused of violating civilians' civil and constitutional rights. And the Chicago

Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

101.    Indeed, in a review of 98 allegations of coerced confessions or fabricated evidence, culled from complaints against officers assigned to Area 1 and lodged with OPS between 1989 and 1996, OPS did not sustain a single one of these allegations.

102.    As a matter of both policy and practice, municipal policymakers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

103.    As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department, officers (including the Defendant Officers here) have come to believe that they may, without fear of adverse consequences, violate the civil rights of members of the public and cause the innocent to be charged with serious crimes. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

104.    The City of Chicago and its Police Department also failed in the years before Plaintiff's wrongful charging and conviction to provide adequate training to Chicago Police Detectives and other officers in the following areas, among others:

> a.    The need to refrain from physical and psychological abuse of, and manipulative and coercive conduct toward, suspects and witnesses.

33

b. The constitutional requirement to disclose exculpatory and impeachment evidence, including how to identify such evidence and what steps to take when exculpatory and/or impeachment evidence has been identified to ensure the evidence is part of the criminal proceeding.

c. The risks of engaging in tunnel vision during investigation.

d. The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

105. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

106. The City's failure to train, supervise, and discipline its officers, including the Defendant Officers, condones, ratifies, and sanctions the kind of misconduct that Defendants committed against Plaintiff in this case. Constitutional violations like those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

107. The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

108.    The City of Chicago's policymakers also approved the policies and practices described in the foregoing paragraphs and were deliberately indifferent to the violations of constitutional rights described herein.

**Plaintiff's Damages**

109.    For 25 years, Tyler was forced to live in a cage and serve out a punishment for a crime he did not commit.

110.    Tyler was required to live in conditions that were inhumane and damaging to the physical and mental health of prisoners. A constant atmosphere of fear, distrust, and threats of violence and violence from prisoners and staff alike permeated the prison environments. For more than two decades, Plaintiff's life was marked by a steady stream of human rights abuses.

111.    During his wrongful incarceration, Tyler was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, funerals, and other life events with loved ones, and was deprived of the fundamental freedom to live his life as an autonomous human being.

112.    Tyler's 25 years of wrongful incarceration forced him into a world of isolation in which he lost contact with many of his friends and family in the outside world.

113.    Tyler must now attempt to make a life for himself outside of prison without the benefit of more than two decades of life experiences, which normally equip adults for the task.

114.    As a result of the foregoing, Tyler has suffered tremendous damage, including physical injury, psychological trauma, and emotional damages, all caused by the Defendants' misconduct.

## COUNT I – 42 U.S.C. §1983

### Coerced and False Confession in Violation of the Fifth and Fourteenth Amendments

115.    Each paragraph of this Complaint is incorporated as if restated fully herein.

116.    As described more fully above, all of the Defendant Officers, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his rights secured by the Fifth and Fourteenth Amendments.

117.    As described more fully above, the Defendant Officers participated in, encouraged, advised, and ordered an unconstitutional and unlawful interrogation of Plaintiff that caused him to make involuntary and false statements implicating himself in the murder of Rodney Collins.

118.    The coerced, involuntary, false statement the Defendant Officers fabricated and attributed to Plaintiff was used against him to his detriment in a criminal case.

119.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

120.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

121.    Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago.

122.    At all relevant times and before the events giving rise to this lawsuit occurred, the City of Chicago promulgated rules, regulations, policies, and procedures for the conduct of

interrogation, testing, and questioning of criminal suspects by officers and agents of the Chicago Police Department. In addition, the City of Chicago promulgated rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department with respect to the conduct of interrogations and the techniques to be used when questioning criminal suspects.

123.    These rules, regulations, policies, and procedures were implemented by officers and agents of the Chicago Police Department, including the Defendant Officers who were responsible for interrogating suspects and witnesses in connection with the Collins homicide investigation.

124.    Additionally, at all times relevant to the events described in this pleading and for a period of time before those events, Defendant City of Chicago had notice of a widespread practice by officers and agents of the Chicago Police Department under which individuals like Plaintiff, who were suspected of criminal activity, were routinely coerced against their will to implicate themselves in crimes of which they were innocent. It was common for suspects interrogated by the Chicago Police Department to falsely confess under extreme duress and after suffering abuse to committing crimes to which they had no connection and for which there was scant evidence to suggest they were involved.

125.    Specifically, at all relevant times and for a period of time before the events giving rise to this case, there existed a widespread practice among officers, employees, and agents of the Chicago Police Department under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to the following: (a) individuals who were subjected to actual and threatened physical and psychological violence; (b) individuals who were interrogated at length without the proper protection of their constitutional

right to have an attorney present or to remain silent; (c) individuals who were forced to sign false statements fabricated by the police; (d) officers and employees who were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily or falsely; and (e) supervisors, with knowledge of permissible and impermissible interrogation techniques, who did not properly supervise or discipline police officers and employees, such that the coercive interrogations continued unchecked.

126. These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of the Chicago Police Department directly encouraged and were thereby the moving force behind the very type of misconduct at issue, by failing to adequately train, supervise, and control their officers, agents, and employees as to proper interrogation techniques, and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses like those that affected Plaintiff.

127. The above widespread practices were so well-settled as to constitute *de facto* policy of the Chicago Police Department and were able to exist and thrive because policymakers exhibited deliberate indifference to the problem, thereby effectively ratifying it.

128. In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

129. The policies, practices, and customs set forth above have resulted in numerous well-publicized false confessions, including the false confessions at issue here, where individuals were convicted of crimes they did not commit after being subjected to abusive interrogation

techniques.

130.     Plaintiff's injuries were caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT II – 42 U.S.C. § 1983

### Unlawful Retaliation Under the First and Fourteenth Amendments

131.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

132.     The Defendant Officers, individually and in conspiracy, violated Plaintiff's First and Fourteenth Amendments rights by retaliating against Plaintiff to chill his exercise of protected speech and silence him from speaking out in the Hernandez homicide and exposing Defendants' misconduct.

133.     A causal connection existed between the Defendants' retaliatory actions and the Plaintiff's protected speech and acts.

134.     Defendants' actions against the Plaintiff would not have been taken absent their retaliatory motive.

135.     Defendants' retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights.

136.     As a direct and proximate result of the Defendants' retaliatory actions, Plaintiff suffered damages, including extreme emotional pain and suffering.

137.      The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

138.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

139.     Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

140.     The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

141.     The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

142.     Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent. The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

143.     Chicago police officers and other employees of the City of Chicago who

40

manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Defendant Officers' misconduct at issue in this case.

144.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

145.    The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

## COUNT III – 42 U.S.C. § 1983

### Violation of Due Process under the Fourteenth Amendment

146.    Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

147.    As described more fully above, the Defendant Officers, while acting individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process and a fair trial.

148.    In the manner described more fully above, the Defendant Officers deliberately withheld exculpatory and impeachment evidence from Plaintiff, his attorneys, and prosecutors, among others, thereby misleading and misdirecting Plaintiff's criminal prosecution.

149.    In addition, as described more fully above, the Defendant Officers fabricated

and solicited false evidence, including statements and testimony they knew to be false, fabricated police reports and other evidence falsely implicating Plaintiff, suborned perjury, obtained Plaintiff's conviction and continued prosecution using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Plaintiff during his criminal trial.

150.    The Defendant Officers concealed and fabricated additional evidence that is not yet known to Plaintiff.

151.    In addition, the Defendant Officers, acting individually, jointly and/or in concert and conspiracy, used unduly suggestive identification procedures to procure a false identification of Plaintiff that was used to deprive him of liberty.

152.    In a manner described more fully above, the Defendant Officers individually, jointly, and/or in concert and in conspiracy, deliberately withheld exculpatory evidence, and destroyed and/or intentionally lost material evidence. In doing so, the Defendants violated their clearly established duties to report all material exculpatory and impeachment information to prosecutors, to preserve material evidence, and to ensure the integrity of eyewitness identifications and statements.

153.    The destruction and/or loss of evidence was done in bad faith, and/or was done so that Plaintiff could not present obviously exculpatory evidence at the trial.

154.    Defendants' misconduct directly resulted in Plaintiff's unjust criminal prosecution and wrongful conviction, thereby denying him his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Plaintiff's prosecution would not and could not have been pursued.

155.    The misconduct described in this Count was objectively unreasonable and was

undertaken intentionally, with malice, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

156.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

157.    Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

158.    The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

159.    The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

160.    Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent. The Department maintained a "code

43

of silence" that effectively eliminated any form of accountability, discipline, or oversight.

161.    Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Defendant Officers' misconduct at issue in this case.

162.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

163.    The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

## COUNT IV – 42 U.S.C. § 1983

### Liberty Deprivation in Violation of the Fourth Amendment

164.    Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

165.    In the manner described more fully above, the Defendant Officers, individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, used fabricated evidence to accuse Plaintiff of criminal activity and detain him without probable cause.

166.    In so doing, the Defendant Officers caused Plaintiff to be deprived of his liberty and detained without probable cause in violation of his rights secured by the Fourth

and Fourteenth Amendments. Specifically, Plaintiff was incarcerated from the date of his arrest continuing for 25 years.

167.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

168.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

169.    Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

170.    The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

171.    The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

172.    Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent. The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

173.    Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Defendant Officers' misconduct at issue in this case.

174.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

175.    The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

## COUNT V – 42 U.S.C. § 1983

### Failure to Intervene

176.    Each paragraph of this Complaint is incorporated as if restated fully herein.

177.    In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Defendant Officers stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they

46

had the opportunity to do so.

178.    As a direct and proximate result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, psychological injury, and emotional distress.

179.    These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

180.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

181.    Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

182.    The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

183.    The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful

convictions.

184.    Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent. The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

185.    Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Defendant Officers' misconduct at issue in this case.

186.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

187.    The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

### COUNT VI – 42 U.S.C. § 1983

### Conspiracy to Deprive Constitutional Rights

188.    Each paragraph of this Complaint is incorporated as if restated fully herein.

189.    After the murder of Rodney Collins, the Defendant Officers, acting within the scope of their employment and under color of law, agreed among themselves and with other

individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

190.     Additionally, before and after Plaintiff's conviction, the Defendant Officers further conspired to deprive Plaintiff of exculpatory information to which he was lawfully entitled and which would have led either to his not being charged, his acquittal, or his more timely exoneration.

191.     In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

192.     In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above—such as fabricating evidence, conducting unduly suggestive lineups, withholding exculpatory evidence, coercing false statements, and committing perjury during hearings and trials—and was an otherwise willful participant in joint activity.

193.     As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, psychological injury, and emotional distress.

194.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's rights. Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals

49

in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

195.    The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

196.    The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

197.    Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent. The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

198.    Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Defendant Officers' misconduct at issue in this case.

199.    The misconduct described in this Count was undertaken pursuant to the

policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

200.    The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

### COUNT VII - 42 U.S.C. § 1983

### Municipal Liability

201.    Each paragraph of this Complaint is incorporated as if restated fully herein.

202.    The actions of all the individual Defendant Officers were undertaken pursuant to policies and practices of the Department, described above, which were ratified by policymakers for the City of Chicago with final policymaking authority.  These policies and practices included but were not limited to the failure to adequately train, supervise, and discipline officers who engaged in the alleged constitutional violations, as set forth in greater detail above. These policies and practices also included a practice of coercing false confessions and fabricating evidence, particularly from young Black men, to close cases as described more fully above.

203.    The policies and practices described in this Count were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiffs' constitutional rights.

204.    As a direct and proximate result of the City's actions, Plaintiffs' constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

205.    The City of Chicago is therefore liable for the misconduct committed by the Defendant Officers.

## COUNT VIII – State Law Claim

### Indemnification

206.    Each paragraph of this Complaint is incorporated as if restated fully herein.

207.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

208.    The Defendant Officers are or were employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described herein.

209.    The City of Chicago is responsible for paying any judgment entered against the Defendant Officers. Plaintiff therefore demands judgment against Defendant City of Chicago in the amounts awarded to Plaintiff against the individual Defendant Officers as damages, attorneys' fees, costs, and interest.

WHEREFORE, Plaintiff SEAN TYLER, respectfully requests that this Court enter judgment in his favor and against Defendants CITY OF CHICAGO, KENNETH BOUDREAU, JAMES O'BRIEN, JOHN HALLORAN, MICHAEL CLANCY, WILLIAM MOSER, ROBERT LENIHAN, THE PERSONAL REPRESENTATIVE OF THE ESTATE OF WILLIAM FOLEY, and UNKNOWN EMPLOYEES OF THE CITY OF CHICAGO, awarding compensatory damages, attorneys' fees and costs against each Defendant, and punitive damages against any of the individually named Defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff SEAN TYLER, hereby demands a trial by a jury pursuant to Federal Rule of

Civil Procedure 38(b) on all issues so triable.

Respectfully Submitted,

 /s/ Jon Loevy
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Gayle Horn
Heather Lewis Donnell
Elliot Slosar
Loevy & Loevy
311 North Aberdeen
3rd Floor
Chicago, Illinois 60607
(312) 243-5900